CUP FOODS, INC., a Minnesota Corporation, and its President Samir Hamaden Abumayyaleh, Relators,

v.

CITY OF MINNEAPOLIS, Respondent.

No. C2–01–399.

Court of Appeals of Minnesota.

Sept. 11, 2001.

Ronald I. Meshbesher, Jonathan M. Peck, Meshbesher & Spence, Ltd., Minneapolis, for relators.

Jay M. Heffern, Minneapolis City Attorney, Scott Reeves, Assistant Minneapolis City Attorney, Minneapolis, for respondent.

Considered and decided by G. BARRY ANDERSON, Presiding Judge, R.A. RANDALL, Judge, and ROBERT H. SCHUMACHER, Judge.

## OPINION

### G. BARRY ANDERSON, Judge.

Respondent city stayed revocation of relator's business licenses subject to store closure for six months and compliance thereafter with several conditions. Relator argues that respondent's decision is not supported by substantial evidence and that the sanction was arbitrary and capricious. Relator also argues that the administrative law judge (ALJ) abused her discretion by denying his motion to strike testimony concerning controlled drug buys. We conclude that there is substantial evidence to support respondent city's finding of good cause for adverse license action against relator. In addition, because relator did not make a timely motion to strike, we conclude that the ALJ acted within her discretion by denying the motion. But because respondent deviated from the ALJ's recommendations when imposing its sanction, without making findings explaining the reasons for doing so, we reverse and remand.

## FACTS

In 1989, relator Samir Abumayyaleh opened a convenience store at the northeast corner of 38th Street and Chicago Avenue South in Minneapolis. The store sold groceries and the usual convenience items. Eventually, relator added numerous goods and services to the store, including a delicatessen, cellular phone and pager sales, tobacco products, and off-sale 3.2 beer.

Respondent City of Minneapolis issued CUP Foods (Chicago Unbeatable Prices) four licenses: (1) grocery store; (2) food manufacturer; (3) tobacco dealer; and (4) off-sale 3.2 beer vendor. Respondent first issued the licenses in 1989 and each is subject to annual renewal. Relator's family, including his father and two younger brothers, work at the store, but relator also employs other workers. Relator's younger brother Nabil, known as "Billy," one of the store employees, has a prior felony conviction for auto theft.

CUP Foods is located in a high-crime area of Minneapolis and, not surprisingly, experienced problems with loitering and drug activity in and around the store. In 1991, relator complained to respondent about the loitering problem, and at a city crime specialist's recommendation, relator placed two yellow "no trespassing" signs outside his store. Respondent conditioned relator's licenses on reduced hours of oper-

ation. On several occasions, however, the store remained open after the designated closing time.

In 1993, after receiving additional complaints about loitering and drug activity near CUP Foods, respondent scheduled a committee meeting to consider adverse license action. As a result of the meeting, relator agreed to remove public pay phones, hire off-duty police officers for security, reduce hours of operation, hire older employees for evening shifts, report drug activity to police, and remove signs blocking store windows. Relator understood that failure to comply with the agreed-on conditions could result in revocation, suspension, or non-renewal of his licenses. Relator complied with the conditions, including the employment of off-duty police officers as security guards. But approximately one-year later, relator discontinued their employment because of the cost and because "things got a lot better at the intersection."

As time went on, however, the crime problem at 38th and Chicago became worse. In 1996, neighborhood residents formed a task force to improve safety and reduce drug-dealing activity in the neighborhood. In 1998, the number of complaints concerning CUP Foods prompted police community crime specialists to open a file on the store. Crime-prevention specialists visited CUP Foods and relator signed a Minneapolis "no trespassing" affidavit and received two new "no trespassing" signs. The specialists advised relator to call 911 to report trouble, and he and his employees did so.

On July 13, 1998, a shooting took place near CUP Foods. Shortly thereafter, relator attended a task-force meeting and asked for a greater police presence at the intersection. A few months later, two more shootings took place near CUP Foods.

Beginning in October 1998, police conducted surveillance of CUP Foods. Police observed loitering and hand-to-hand exchanges outside the store and in the store entryway. Using confidential informants, police made several "controlled buys" of either crack cocaine or apparent crack cocaine inside CUP Foods.

Based on the results of the controlled buys, police obtained a search warrant for CUP Foods and executed that warrant on November 18, 1998. Police recovered: stolen cell phones; a bullet-proof vest; live ammunition; a stolen bicycle; ephedrine, an ingredient in methamphetamine; glass tubing; baggies of what appeared to be crack cocaine (but later proved to lack cocaine base); postal scales; and three firearms. Police also observed bullet holes in a door. The state charged Nabil Abumayyaleh with unlawful possession of a firearm, but later dismissed that charge. Police did not link any of the stolen items to relator, and did not charge him with any crime.

Police continued to make controlled buys in CUP Foods during 1999. On one occasion, the participants completed a transaction in plain view of Nabil Abumayyaleh as he worked as a cashier. On November 9, 1999, a Minneapolis police officer recovered crack cocaine from a CUP Foods shelf during the course of answering a call reporting an armed man in the area.

In November 1999, the Hennepin County Attorney's Office commenced a nuisance-abatement proceeding against CUP Foods. That proceeding was stayed pending the city's resolution of appellant's licensing issues because, on November 19, 1999, respondent filed a notice of hearing concerning all CUP Foods licenses. Respondent filed amended notices on February 25, 2000, and again on March 27, 2000.

An ALJ conducted evidentiary hearings on March 28, 30, and 31, and on May 5 and 15, 2000. Respondent presented testimony from police and neighbors, and argued for revocation of relator's licenses. Relator presented favorable testimony from neighbors and customers, testified to his own compliance with recommendations, and explained that he, too, sought to end the criminal activity near the intersection.

The ALJ concluded that respondent had shown good cause for taking adverse action against CUP Foods, but recommended that the city council consider placing conditions on CUP Foods licenses, rather than revoking the licenses outright. On December 29, 2000, the Minneapolis City Council adopted the ALJ's report but, rather than placing conditions on relator's business licenses, it revoked all the licenses, stayed on the conditions that CUP Foods (1) close for six months and (2) take additional specified crime-prevention measures upon re-opening. The council, however, waived 90 days of the closure period, upon relator's payment of a $10,000 administrative fine. The mayor approved the decision on January 4, 2001. Relator now proceeds by writ of certiorari.

## ISSUES

I. Was respondent city's decision to stay revocation of relator's business licenses, subject to conditions, a denial of due process, arbitrary and capricious, or unsupported by substantial evidence?

II. Did the ALJ violate relator's right to due process of law by denying relator the opportunity to cross-examine confidential informants who made controlled buys at CUP Foods?

## ANALYSIS

### I.

Appellant first argues that respondent city's decision to revoke his business licenses is arbitrary and capricious, is unreasonable, is irrational, and not supported by substantial evidence, and that it violates his due-process rights because neither relator nor his employees had direct knowledge that drug activity took place inside CUP Foods.

■ Generally, decisions of administrative agencies, including cities, enjoy a presumption of correctness and will be reversed only when they reflect an error of law or where the findings are arbitrary, capricious, or unsupported by substantial evidence. *Cable Communications Bd. v. Nor–West Cable Communications P'ship*, 356 N.W.2d 658, 668 (Minn.1984); *see also* Minn.Stat. § 14.69 (2000) (setting forth the scope of judicial review).

■ Where the evidence is conflicting or more than one inference may be drawn from the evidence, findings must be upheld. *City of Minneapolis v. Richardson*, 307 Minn. 80, 88, 239 N.W.2d 197, 202 (1976). If the agency engaged in reasoned decision-making, a reviewing court will affirm its decision even though the court may have reached another conclusion. *State by Khalifa v. Hennepin County*, 420 N.W.2d 634, 639 (Minn.App.1988), *review denied* (Minn. May 4, 1988).

*A. Due Process*

■ Relator argues that respondent's decision denies him "due process of law." To determine what process is due, this court first determines whether a property interest is implicated. *Humenansky v. Minnesota Bd. of Med. Exam'rs*, 525 N.W.2d 559, 566 (Minn.App.1994), *review denied* (Minn. Feb. 14, 1995). Relator correctly points out that he has a property

interest in his business licenses. *See Bird v. Dep't of Pub. Safety,* 375 N.W.2d 36, 42 (Minn.App.1985) (finding property interest in automobile dealer's license). Our second inquiry requires weighing the particular interests involved. *Humenansky,* 525 N.W.2d at 566.

■ Sufficient due process generally requires reasonable notice and a hearing. *In re License of W. Side Pawn,* 587 N.W.2d 521, 522 (Minn.App.1998), *review denied* (Minn. Mar. 30, 1999). Although relator argues that he was denied due process, he does *not* allege that he was denied either reasonable notice or an opportunity to be heard. The record shows relator received initial notice of the hearings approximately four months before the license proceedings, a five-day trial-type hearing, representation by counsel, an impartial decision-maker, and a decision based solely on the record. This is sufficient to satisfy the due-process requirement. *See Humenansky,* 525 N.W.2d at 565 (describing the process due when property interests are implicated).

*B. Substantial Evidence*

■ Relator argues that respondent violated his due-process rights because revocation

> extinguishes [relator's] property interest and deprives [relator] from making a living without a factual finding that either [relator] or any of his employees permitted, encouraged, or had any direct knowledge of the alleged controlled buys.

In essence, relator alleges that respondent lacked substantial evidence of "good cause" to take adverse license action against relator's business.

■ Substantial evidence, for the purpose of appellate review of an administrative agency's decision, is: (1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; and (5) evidence considered in its entirety. *In re Friedenson,* 574 N.W.2d 463, 467 (Minn.App.1998) (citation omitted), *review denied* (Minn. Apr. 30, 1998). We defer to the agency's fact-finding process and it is the challenger's burden to establish that the findings are not supported by the evidence. *In re Lakedale Telephone Co.,* 561 N.W.2d 550, 554 (Minn.App.1997). Unless manifestly unjust, inferences must be accepted even though it may appear that contrary inferences would be better supported by the record. *Id.* Thus, relator must show that the evidence, considered in its entirety, and drawing inferences in favor of the decision, is not substantial, and, therefore, does not adequately support respondent's finding that good cause existed to take adverse action against his business licenses.

The Minneapolis Code of Ordinances provides that "[a]ny license granted under this chapter may be revoked by the mayor or the city council as in the city charter provided." Minneapolis, Minn., Code of Ordinances § 188.350 (1999). The city charter provides:

> Section 16. Licenses May Be Revoked. Any license issued by the authority of the City Council may be revoked by the City Council at any time upon proper notice and hearing for good cause * * *.

Minneapolis, Minn., City Charter ch. 4, § 16.

The ALJ's memorandum explained that relator's employment of his brother Nabil Abumayyaleh, a convicted felon, and the handguns found during the search of CUP Foods, did not warrant taking adverse license action against relator because relator legally employed his brother and legal-

ly possessed the handguns for protection. Similarly, the ALJ found that, because respondent failed to link any of the stolen items recovered during execution of the 1998 search warrant to relator, that evidence alone did not support adverse license action. Further, the ALJ found that the three shootings near CUP Foods had no connection to the store and were simply a "by-product of the gang violence that is prevalent in this south Minneapolis neighborhood."

But respondent, through the testimony of police officers and neighbors, presented evidence of: (1) chronic loitering at CUP Foods; (2) numerous hand-to-hand exchanges, an indication of drug dealing, taking place in and outside the store; and (3) controlled drug buys inside the store. Respondent also presented evidence that despite the earlier license conditions, the store's windows remain obstructed by advertising, signs, and shelving, and that the lack of visibility inside the store hampers law-enforcement efforts.

For these reasons, the city council adopted the ALJ's conclusion that

[respondent] has demonstrated by a preponderance of the evidence that drug dealing and loitering have occurred on a frequent basis on and near CUP Foods' premises. * * * [Relator's] failure or inability to prevent or meaningfully control the sale of drugs occurring inside his store constitutes good cause for taking adverse action against CUP Foods' licenses. While [relator] testified that he routinely asks loiterers to leave, substantial credible

testimony from neighborhood residents and police officers established that there is an ongoing pattern of loitering and drug dealing both inside the store and outside the store's front entrance. And, despite some measures taken by [relator] to increase visibility in his store, the record established that the majority of the store's windows remain obstructed by shelving, advertisements, and other signage. The inability to see into the store's windows encourages loitering and criminal activity in general at CUP Foods.

Although there is no direct evidence that relator or his employees observed drug transactions, there is ample evidence, including the evidence of the controlled buys, that such transactions took place in and around CUP Foods and that relator knew that crime in and near the store was an ongoing problem. Although relator made efforts to improve security and reduce crime, he failed to decrease the height of store shelves or remove window advertisements, and, until very recently, relator had abandoned the use of security guards.

Drawing inferences in favor of respondent city's decision, as we must, and viewing the record as a whole, we conclude that the evidence, though hardly overwhelming, is reasonable, "more than a scintilla," "more than some," and "more than any" evidence. The evidence, therefore, is substantial and supports the conclusion that respondent had "good cause" to take adverse license action against relator.[1]

---

1. Relator devotes more than three pages of his brief to a discussion of *Saxon Coffee Shop, Inc. v. Boston Lic. Bd.,* 380 Mass. 919, 407 N.E.2d 311 (1980). In *Saxon,* a license-revocation action, criminal activity inside a store and the non-cooperation of the store's management did not meet the substantial-evidence test. *Id* at 319. We reject *Saxon's*

reasoning because *City of Mankato v. Mahoney,* 542 N.W.2d 689 (Minn.App.1996), suggests that a city may take adverse-license action in response to criminal activity if the licensee does not cooperate to prevent future violations. *Id.* at 692 (reversing revocation of landlord's license where landlord acted res-

*C. Arbitrary and capricious*

 Relator also argues that the adverse license action is arbitrary and capricious. Reviewing courts may reverse an agency's decision if the decision is arbitrary or capricious. Minn.Stat. § 14.69(f) (2000). An agency decision is arbitrary and capricious if it is an exercise of the agency's will, rather than its judgment, or if the decision is based on whim or is devoid of articulated reasons. *Friedenson*, 574 N.W.2d at 467; *Mammenga v. State Dept. of Human Servs.*, 442 N.W.2d 786, 789 (Minn.1989). "Where there is room for two opinions on the matter, [an agency's choice of one course of] action is not arbitrary and capricious * * *." *Friedenson*, 574 N.W.2d at 467 (citing *Brown v. Wells*, 288 Minn. 468, 472, 181 N.W.2d 708, 711 (1970)).

The problems at CUP Foods illustrate the collision between two important principles of United States jurisprudence: the reasonable public safety expectations of citizens and the preservation of private property rights, which, in this case, take the form of business licenses.

 A city council may affirm, reject, or modify an ALJ's findings or conclusions. *See Hymanson v. City of St. Paul*, 329 N.W.2d 324, 326–27 (Minn.1983) (a city council may make new findings or decide contrary to the hearing examiner's recommendations). Despite this authority, when an agency significantly deviates from a reviewing authority's conclusions, it must explain the deviation. *Beaty v. Minnesota Bd. of Teaching*, 354 N.W.2d 466, 472 (Minn.App.1984). Failure to do so "evidences the agency's desire to exercise its will and not its judgment." *Id.*; *see also Burnett v. Stearns County Welfare Bd.*, 370 N.W.2d 452, 455 (Minn.App. 1985) (holding county welfare board acted

ponsibly to prevent further violations of city

arbitrarily and capriciously by rejecting without comment merit system council recommendation to grant relator a merit increase). *But see Friedenson*, 574 N.W.2d at 467–68 (holding revocation of relator's medical license not arbitrary and capricious, even though board failed to explain its reasons for deviating from ALJ's findings of fact and conclusions of law, because reviewing court was satisfied penalty was the product of "careful and prudent judgment").

Respondent adopted the ALJ's findings, as well as the conclusions supported by those findings. But respondent did not adopt the ALJ's recommendations to place conditions on relator's business licenses, and instead stayed revocation on the conditions that CUP Foods close for six months and, upon re-opening, comply with numerous crime-prevention measures. Respondent significantly deviated from the ALJ's recommendations without explaining why the ALJ's recommendations were rejected or making additional findings to support this disposition. At a minimum, a business owner with property rights in the form of government licenses is entitled to know the reasons for adverse action by the city council. We therefore hold that the absence of such findings renders the respondent city's decision arbitrary and capricious, and we reverse and remand for additional proceedings and to permit respondent to make appropriate findings explaining its decision.

We caution respondent, however, that any additional findings or conclusions it may adopt on remand, to explain its reasons for significantly deviating from the ALJ's recommendations, must be limited to the issues raised in the earlier proceedings. *See Interstate Power Co. v. Nobles County Bd. of Comm'rs*, 617 N.W.2d 566,

noise codes).

580 (Minn.2000); *Earthburners, Inc. v. County of Carlton,* 513 N.W.2d 460, 463 (Minn.1994) (reviewing board "must confine its inquiry to those issues raised in [the] earlier proceedings"); *White Bear Rod & Gun Club v. City of Hugo,* 388 N.W.2d 739, 742 (Minn.1986) (city council not required to make formal findings but, at a minimum, must " 'have the reasons for its decision recorded or reduced to writing and in more than just a conclusory fashion' " (quotation omitted)).

## II.

Relator also argues that the ALJ abused her discretion by denying relator's motion to strike testimony concerning the confidential informants who completed "controlled buys" inside CUP Foods, contending that by failing to strike that testimony the ALJ denied him his right to confront the informants. Evidentiary rulings in administrative proceedings are subject to an abuse-of-discretion standard. *See Lee v. Lee,* 459 N.W.2d 365, 369 (Minn.App.1990) (applying abuse-of-discretion standard to appeal of evidentiary ruling on hearsay evidence made during an administrative child-support hearing conducted under Minnesota Administrative Procedure Act rules), *review denied* (Minn. Oct. 18, 1990).

During the license hearings, respondent's counsel questioned Sherry Appledorn, the police officer who arranged the controlled buys, about her conversations with the confidential informants. Relator's counsel objected on hearsay grounds. The ALJ sustained the objection, but permitted the officer to testify concerning matters within her own knowledge. At the close of the hearings, relator moved to strike all testimony concerning the controlled buys on the basis that he was denied the right to confront the informants. The ALJ ruled that the request was un-

timely. Respondent argues that this court need not reach the issue of confrontation because relator's motion to strike was untimely. We agree.

The rule that an objection to the admission of evidence must be made at the time the evidence is offered is well established. *Eilola v. Oliver Iron Mining Co.,* 201 Minn. 77, 79, 275 N.W. 408, 409 (1937); *see also* Minn. R. Evid. 103(a)(1) (providing that there is no error unless an evidentiary ruling affects a substantial right of a party and a timely objection or motion to strike is made). Although relator objected to out-of-court statements made by the informants as hearsay, relator did not (1) bring any motion to compel respondent to disclose the informants' identities, even though the initial notice of hearing indicated that the controlled buys would be part of respondent's evidence, or (2) object to the admission of Appledorn's testimony concerning her knowledge of the controlled buys until the close of the hearing in May 2000, more than one month after she testified. We therefore conclude that the ALJ acted within her discretion by denying relator's motion to strike, and we decline to further address relator's confrontation claims.

## DECISION

Respondent's conclusion that there is good cause to take adverse license action against relator is supported by substantial evidence. Respondent's decision to deviate from the sanctions recommended by the ALJ, however, is arbitrary and capricious because the deviations are significant and respondent did not make findings explaining its decision to deviate. Finally, the ALJ did not abuse her discretion by denying relator's motion to strike testimony concerning controlled drug buys because the motion was untimely.

Affirmed in part, reversed in part, and remanded.