In the Matter of DETAILING CRITE-
RIA AND STANDARDS FOR MEAS-
URING AN ELECTRIC UTILITY'S
GOOD FAITH EFFORTS IN MEET-
ING THE RENEWABLE ENERGY
OBJECTIVES UNDER MINN. STAT.
216B.1691.

No. A04–1742.

Court of Appeals of Minnesota.

July 26, 2005.

Elizabeth Goodpaster, Minnesota Center for Environmental Advocacy, St. Paul, MN, for relators Izaak Walton League of America, Minnesotans for an Energy–Efficient Economy, and Minnesota Center for Environment Advocacy.

Mike Hatch, Attorney General, Kari Valley Zipko, Assistant Attorney General, St. Paul, MN, for respondent Minnesota Public Utilities Commission.

Denis R. Vogel, Mary Beth Peranteau, Wheeler, Van Sickle & Anderson, S.C., Madison, WI, for respondent Dairyland Power Cooperative.

Michael J. Bradley, Moss & Barnett, Minneapolis, MN, for respondents Great River Energy, Interstate Power and Light Company, Minnesota Power, Otter Tail Power, Southern Minnesota Municipal Power Agency, and Northern States Power Company d/b/a Xcel Energy.

Delmar R. Ehrich, John F. Jeske, Faegre & Benson LLP, Minneapolis, MN, for respondent Minnesota Chamber of Commerce.

Considered and decided by WRIGHT, Presiding Judge; KALITOWSKI, Judge; and DIETZEN, Judge.

## OPINION

WRIGHT, Judge.

The Minnesota Public Utilities Commission (PUC) issued an order that set certain objectives for the use of renewable energy resources by electric utilities. On certiorari review, relators assert that the PUC committed an error of law by misinterpreting the statute that establishes these objectives. In the alternative, relators argue that the PUC made an arbitrary and capricious decision by adopting inconsistent methods for determining the objectives for biomass energy technologies as compared to all eligible energy technologies. We affirm.

## FACTS

In 2001, the Minnesota Legislature enacted Minn.Stat. § 216B.1691, which establishes objectives for the use of renewable energy resources by electric utilities. 2001 Minn. Laws ch. 212, art. 8, § 3. Section 216B.1691 provides that each electric utility "shall make a good faith effort" to generate a prescribed amount of electricity for its retail customers from a defined "eligible energy technology." Minn.Stat. § 216B.1691, subds. 1, 2(a) (2002). With respect to the utilities' compliance with these objectives, the PUC lacked enforcement authority but was directed to propose regulatory or legislative action to the

Minnesota Legislature. *Id.,* subd. 2(b), (c) (2002).

The Minnesota Legislature made substantial amendments to section 216B.1691 in 2003. 2003 Minn. Laws 1st Spec. Sess. ch. 11, art. 2, § 3. The amendments established a more detailed definition of "eligible energy technology" and required the implementation of these technologies to be measured as a percentage of total retail electric sales. Minn.Stat. § 216B.1691, subds. 1(a)(1), (c), 2(a) (2004). The amendments also expanded the responsibilities of the PUC, requiring it to issue standards and reports on whether the utilities had made a good faith effort to implement eligible energy technologies. *Id.,* subd. 2(c), (d) (2004).

In accordance with the new amendments, on January 30, 2004, the PUC provided notice and solicited comment on the standards for determining the utilities' compliance with Minn.Stat. § 216B.1691. Among the issues considered was whether generation from eligible energy technologies may be from preexisting capacity or whether it should be from new sources. The PUC also requested comment on how to deal with inconsistent annual increases from the implementation of eligible energy technologies, which it characterized as the problem of " 'lumpy' increments [when] measuring whether the year-by-year objectives are being met." But the PUC did not directly solicit comment on the broader question of how to determine from year to year the percentage increase in retail electric sales each utility should derive from eligible energy technologies.

With respect to the latter question, most utilities asserted that the statute set a one-percent baseline for total retail electric sales from eligible energy technologies in 2005 and required an increase by one percentage point each year until sales from eligible energy technologies reached 10 percent of total retail sales in 2015. The utilities argued that compliance with the objectives of section 216B.1691 would be achieved as long as total retail electric sales from eligible energy technologies exceeds this annual benchmark.

Relators Izaak Walton League of America, Minnesotans for an Energy–Efficient Economy, and Minnesota Center for Environmental Advocacy (collectively Izaak Walton) countered that the statute did not set a uniform baseline percentage for all utilities. Under its theory, the percentage of sales necessary for compliance with section 216B.1691 would not be capped at 10 percent. Rather, it would vary by utility according to the amount of generation from eligible energy technologies each utility had established the previous year. Thus, once a utility established its annual percentage of retail electric sales from eligible energy technologies, the utility was directed to exceed that percentage by at least one percent the following year. For example, a utility that produced four percent annual retail electric sales from eligible energy technologies in year two would be required to achieve no less than five percent in year three.

The PUC issued its initial order setting standards for determining compliance with section 216B.1691 on June 1, 2004. The PUC's standards permit preexisting generation to qualify for the percentage of retail electric sales from eligible energy technologies. The PUC also adopted the position advanced by the utilities and held that the statute provides a progressive annual baseline percentage of retail electric sales required. This certiorari appeal followed.

## ISSUES

I. Did the PUC err in concluding that, under Minn.Stat.

§ 216B.1691, subd. 2(a) (2004), each utility is given an overall objective of generating 10 percent of total electric retail sales from eligible energy technologies by 2015, with a one-percent initial objective in 2005 and an annual one-percent increase?

II. Was the PUC's adoption, under Minn.Stat. § 216B.1691, subd. 2(b) (2004), of different standards for calculating the percentage of electrical generation from biomass energy technologies as compared to all renewable eligible energy technologies arbitrary and capricious?

## ANALYSIS

◼ Appellate review of an agency decision is governed by the Minnesota Administrative Procedures Act, which provides in relevant part:

> In a judicial review ... the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
> ...
> (d) Affected by ... error of law; or
> ...
> (f) Arbitrary or capricious.

Minn.Stat. § 14.69 (2004); *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 463–64 (Minn.2002). The decision of an agency is presumed to be correct, and we ordinarily accord deference to an agency in its field of expertise. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977).

### I.

### A.

◼ Izaak Walton principally argues that the PUC committed an error of law in its interpretation of the objectives for the use of renewable resources set out in Minn.Stat. § 216B.1691, subd. 2(a) (2004). When an agency's decision is based solely on statutory interpretation, we are presented with a question of law, which we review de novo. *In re Denial of Eller Media Co.'s Applications for Outdoor Adver. Device Permits*, 664 N.W.2d 1, 7 (Minn.2003) (citing *St. Otto's Home v. Minn. Dep't of Human Servs.*, 437 N.W.2d 35, 39–40 (Minn.1989)).

The object of statutory interpretation is to give effect to the intention of the legislature. *Educ. Minn.-Chisholm v. Indep. Sch. Dist. No. 695*, 662 N.W.2d 139, 143 (Minn.2003). If the meaning of a statute is clear, then it shall be given effect according to its plain language. *Molloy v. Meier*, 679 N.W.2d 711, 723 (Minn.2004). But if a statute is reasonably susceptible of more than one meaning, we employ other canons of construction to discern the legislature's intent. *Gomon v. Northland Family Physicians, Ltd.*, 645 N.W.2d 413, 416 (Minn. 2002). In doing so, we apply principles of statutory construction in conjunction with a searching examination of the entire text. *Educ. Minn.-Chisholm*, 662 N.W.2d at 143. We construe the words and phrases in a statute in accordance with the rules of grammar and common and approved usage. Minn.Stat. § 645.08(1) (2004); *Sprint Spectrum LP v. Comm'r of Revenue*, 676 N.W.2d 656, 662 (Minn.2004). No part of statutory language shall be disregarded as insignificant. Minn.Stat. § 645.16 (2004); *Vlahos v. R & I Constr. of Bloomington, Inc.*, 676 N.W.2d 672, 679 (Minn.2004).

◼ As established by the Minnesota Legislature, the renewable energy objectives for public utilities provide that

> [e]ach electric utility shall make a good faith effort to generate or procure

sufficient electricity generated by an eligible energy technology to provide its retail customers . . . so that:

(1) commencing in 2005, at least one percent of the electric utility's total retail electric sales is generated by eligible energy technologies;

(2) the amount provided under clause (1) is increased by one percent of the utility's total retail electric sales each year until 2015; and

(3) ten percent of the electric energy provided to retail customers in Minnesota is generated by eligible energy technologies.

Minn.Stat. § 216B.1691, subd. 2(a). The controversy here requires us to examine how the phrase "at least" informs the obligation in clause (1). Izaak Walton argues that "at least" implies an individual benchmark for each utility based on its preexisting generation. Thus, it asserts that the annual increases under clause (2) are in addition to any preexisting generation and that the utilities annually must add new generation from eligible energy technologies to maintain compliance with section 216B.1691. The utilities assert that "at least" implies a uniform minimum baseline

of one percent that increases an additional percent annually in accordance with clause (2). Because the statutory language is susceptible of more than one reasonable interpretation, we resolve this ambiguity by utilizing canons of statutory interpretation.

■ When considering possible meanings for the phrase "at least," a plain reading of clauses (1) and (2) does not offer any clear guidance. But a searching examination of the statutory text requires us to construe the language of clauses (1) and (2) in the context of the entire subdivision. Without establishing a specific timeline for compliance, clause (3) provides for 10 percent of total electric sales to retail customers to be generated from eligible energy technologies. When this goal is considered in conjunction with clauses (1) and (2), which provide a discrete 10–year period for implementing these technologies, we conclude that this statutory scheme sets a baseline objective of one percent in 2005 with annual increases of one percent so as to reach the 10–percent objective by 2015.[1]

Asserting that the 10–percent goal in clause (3) is merely an "overall industry

---

1. Our interpretation is supported in part by the legislative history of Minn.Stat. § 216B.1691 (2004). We may consider legislative hearings and proposed amendments to resolve ambiguity in statutory language. *Baker v. Ploetz*, 616 N.W.2d 263, 269 (Minn. 2000). But statements on the meaning of a particular provision should be treated with caution. *Handle With Care, Inc. v. Dep't of Human Servs.*, 406 N.W.2d 518, 522 & n. 8 (Minn.1987).

The guidelines for the amount of generation from eligible energy technologies were not settled until hearings before a conference committee on May 20, 2001. Describing the effect of the guidelines to the committee, Senate Counsel John Fuller explained:

It used to be a requirement . . . to phase in by 2015 ten percent renewable[ ] energy sources for the energy they provide to their

retail customers in Minnesota. And now the way this language reads is that it's a goal. It's a goal for each of these entities to reach in the same timeframe the same percentages. . . .

House Counsel Michael Bull added:

The house [members of the conference committee] then agreed with the senate [members of the conference committee] to set some pretty good goals—actually, "objectives" is the term we used—for renewable energy, still the one percent per year for the ten years.

Hearing on S.F. No. 722 Before the Conference Comm. (May 20, 2001). Both of these statements support an inference that the legislature intended a minimum benchmark of one percent in 2005, to increase annually by one-percent increments through 2015.

objective," Izaak Walton claims that clause (3) contemplates objectives beyond 10 percent for individual utilities with preexisting generation in renewable energy. Rather than viewing clause (3) as part of the guidelines in subdivision 2, this interpretation treats clause (3) as a statement of general policy. Izaak Walton's argument disregards the placement of clause (3) among the other guidelines for implementation of renewable energy objectives. Because the interpretation advanced by Izaak Walton would undermine the significance of applying the 10–percent objective to "[e]ach electric utility" and render this aspect of the statute largely superfluous, we decline to adopt it.

### B.

We next consider what constitutes "eligible energy technology" under the statute. The utilities argue that, because preexisting generation is not excluded from the statutory definition of "eligible energy technology," the renewable energy objectives cannot be interpreted to exclude preexisting generation from satisfying the objectives.

> Unless otherwise specified in law, "eligible energy technology" means an energy technology that:
>
> (1) generates electricity from the following renewable energy sources: solar; wind; hydroelectric with a capacity of less than 60 megawatts; hydrogen, provided that after January 1, 2010, the hydrogen must be generated from the resources listed in this clause; or biomass, which includes an energy recovery facility used to capture the heat value of mixed municipal solid waste or refuse-derived fuel from mixed municipal solid waste as a primary fuel; and
>
> (2) was not mandated by Laws 1994, chapter 641, or by commission order

issued pursuant to that chapter prior to August 1, 2001.

Minn.Stat. § 216B.1691, subd. 1(a) (2004). Nothing in the plain language of this definition suggests that, when determining whether certain sources are eligible energy technologies, the time of implementation is relevant. Rather, the criteria are qualitative—based on the type of energy source and whether that energy source was previously mandated.

■ When, as here, the statutory language is ambiguous, the inclusion of certain terms in the statute implies that other terms are excluded. *Green–Glo Turf Farms, Inc. v. State,* 347 N.W.2d 491, 494 (Minn.1984). Furthermore, the historical record of amendments to that language may be employed to resolve ambiguity. *Baker v. Ploetz,* 616 N.W.2d 263, 269 (Minn.2000).

Before section 216B.1691 was enacted in 2001, the Minnesota Legislature considered versions of the statute that would exclude preexisting generation from counting toward the renewable energy objectives. *See* S.F. 722, second engrossment ("Fifty percent of the renewable energy generated by wind energy facilities operational on or before December 31, 2000, and by biomass energy facilities operated on or before December 31, 2002, may be counted as renewable energy for purposes of determining compliance...."); S.F. 722, Amend. Before the Telecomms., Energy, and Utils. Comm. (Mar. 22, 2001) ("Renewable energy generated by wind energy facilities operational on or before December 31, 2000, and by biomass energy facilities operated on or before December 31, 2002, may not be counted as renewable energy for purposes of determining compliance....") But the version of the statute that was enacted only excludes certain mandated sources of preexisting genera-

tion. *See* Minn.Stat. § 216B.1691, subd. 1(a)(2).

This legislative history supports the proposition that nonmandated sources of preexisting generation are included among eligible energy technologies. We conclude that a utility's preexisting generation may count toward its good faith effort to satisfy the renewable energy objectives of section 216B.1691, subdivision 2(a). Our conclusion comports with our prior determination that the renewable energy objectives set an overall goal of generating 10 percent of total retail electric sales from eligible energy technologies for each utility. Rather than requiring annual increases through new generation from eligible energy technologies, the annual increase of one percent serves as a benchmark to achieve the overall goal.

## II.

■ Izaak Walton next asserts that, because the PUC adopted different methods for calculating electrical generation from biomass energy technologies as compared to all eligible energy technologies, the decision was arbitrary and capricious. An agency decision is arbitrary and capricious if it reflects an exercise of the agency's will rather than an exercise of its judgment, *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278–83 (Minn.2001), or if the agency relies on factors that the legislature did not intend the agency to consider, fails to consider an important aspect of the issue, provides an explanation that is contrary to the record, or renders a decision so implausible that it could not be ascribed to agency expertise, *Trout Unlimited, Inc. v. Minn., Dep't of Agric.*, 528 N.W.2d 903, 907 (Minn.App.1995) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867,

77 L.Ed.2d 443 (1983)), *review denied* (Minn. Apr. 27, 1995).

■■ An agency decision is not arbitrary and capricious if the agency, presented with opposing points of view, reaches a reasoned decision that rejects one point of view. *CUP Foods, Inc. v. City of Minneapolis*, 633 N.W.2d 557, 565 (Minn.App. 2001), *review denied* (Minn. Nov. 13, 2001); *In re Petition of Minn. Power for Authority to Change Its Schedule of Rates for Retail Elec. Serv.*, 545 N.W.2d 49, 51–52 (Minn.App.1996). And although an agency is not bound to follow its past decisions, it must provide a reasonable basis for departure from precedent. *In re Petition of N. States Power Gas Util. For Authority to Change its Schedule of Gas Rates*, 519 N.W.2d 921, 925 (Minn.App.1994); *Peoples Natural Gas Co. v. Minn. Pub. Utils. Comm'n*, 342 N.W.2d 348, 352–53 (Minn. App.1983), *review denied* (Minn. Apr. 24, 1984).

■ Izaak Walton's argument is based in part on the PUC's interpretation of the biomass provisions of section 216B.1691, which provide:

Of the eligible energy technology generation required under [subdivision 2(a)], clauses (1) and (2), not less than 0.5 percent of the energy must be generated by biomass energy technologies . . . by 2005. By 2010, one percent of the eligible technology generation required under paragraph (a), clauses (1) and (2), shall be generated by biomass energy technologies.

Minn.Stat. § 216B.1691, subd. 2(b) (2004). The PUC observed that, with respect to the one-half-percent and one-percent requirements, the statute is ambiguous as to whether the percentage is taken from total retail electric sales or from the amount of energy generated by eligible energy technologies. After providing notice and soliciting comments, the PUC concluded that,

under the plain language of the statute, the percentages pertain to the "eligible energy technology generation," not total retail electric sales. Acknowledging dissent by interested parties on the issue, the PUC stated that it would inform the legislature about this potential "drafting anomaly."

Our examination of the PUC's reasoning establishes that the PUC's decision reflects its judgment rather than its will. Subdivision 2(b) provides that "not less than 0.5 percent of the energy" must be generated from biomass energy technologies. The phrase "of the energy" plainly relates back to the opening phrase of the subdivision, which refers to "eligible energy technology generation" under subdivision 2(a). The only reasonable construction of this language is that the percentages in subdivision 2(b) are applied to the amount of eligible energy technology generation, not total retail electric sales.

Because the PUC adopted a plain language construction for subdivision 2(b) but did not do so for the controverted portions of subdivision 2(a), Izaak Walton contends that the decision was arbitrary and capricious. This argument, however, erroneously presumes that the legal issues presented by subdivisions 2(a) and 2(b) are substantially identical and thus call for substantially identical construction. But subdivision 2(a) controls all eligible energy technologies and measures their implementation as a percentage of total retail electric sales, whereas subdivision 2(b) controls biomass energy technologies as a subset of eligible energy technologies and does not relate its implementation to total retail electric sales. When considering these distinct provisions, the PUC carefully examined the statutory language and rendered its sound judgment. According-

ly, the PUC's decision was not arbitrary and capricious.

## DECISION

The PUC did not commit an error of law by concluding that the renewable energy objectives of Minn.Stat. § 216B.1691, subd. 2(a) (2004), direct each electric utility to make a good faith effort to ensure that 10 percent of total electric sales to retail customers is generated by eligible energy technologies by 2015, with a one-percent initial objective in 2005 and a benchmark increase of one percent annually. The PUC's adoption of different methods for calculating electrical generation from biomass energy technologies as compared to all eligible energy technologies was not arbitrary and capricious.

**Affirmed.**