*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1365**


Ever Cat Fuels, LLC,
Relator,

vs.

Ken Peterson, Commissioner,
Department of Labor and Industry, State of Minnesota,
Respondent,

Occupational Safety and Health Review Board, State of Minnesota,
Respondent.


**Filed May 23, 2016
Affirmed
Halbrooks, Judge**


Occupational Safety and Health Review Board
File No. 8-1901-31230

Lindsay G. Arthur, Jr., Sarah E. Bushnell, Jeffrey M. Markowitz, Arthur, Chapman, Kettering, Smetak & Pikala, P.A., Minneapolis, Minnesota (for relator)

Lori Swanson, Attorney General, Scott A. Grosskreutz, Rachel E. Bell, Assistant Attorneys General, St. Paul, Minnesota (for respondent department)

Lori Swanson, Attorney General, Erik M. Johnson, Assistant Attorney General, St. Paul, Minnesota (for respondent board)

Considered and decided by Halbrooks, Presiding Judge; Bjorkman, Judge; and Toussaint, Judge.[*]

## UNPUBLISHED OPINION

**HALBROOKS**, Judge

Relator challenges the decision of the Minnesota Occupational Safety and Health (MN OSHA) Review Board that because the methanol in its T-407 tank is neither stored nor transferred, it is subject to the requirements of 29 C.F.R. § 1910.119 (2015). We affirm.

## FACTS

In 2008, relator Ever Cat Fuels, LLC, built a 9,000-square-foot biodiesel-fuel production plant near Isanti. The plant became operational in September 2009. Ever Cat's plant produces approximately three million gallons of biodiesel fuel every year. The plant is in continuous operation every hour of every day with interruptions only for maintenance or unplanned events.

To produce biodiesel fuel, Ever Cat uses the McGyan process, which involves the blending of liquid methanol and lipid feedstock.[1] Liquid methanol is delivered to and stored in tank T-101, a 75,000-gallon atmospheric tank. The methanol from T-101 is transferred through a permanent pipe to tank T-407, an atmospheric tank with a capacity

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

[1] Lipid feedstock, according to one of Ever Cat's founders and chief science officer, is some type of fat or oil, typically a vegetable oil or an animal fat like tallow or lard.

of 2,000 gallons. T-407 usually contains 800 to 1,000 gallons of methanol at any given time.

The methanol in T-407 is continuously pumped at a rate of eight gallons per minute into a T junction located inside one of Ever Cat's production buildings. At the T junction, the methanol is mixed with lipid feedstock, which comes from a separate source. The mixture passes through filters and a heat exchanger that brings the two elements up to the desired reaction temperatures. The mixture is then pumped through a reactor where a chemical reaction occurs that produces biodiesel fuel and waste products.

Only 10% of the liquid methanol sent from T-407 is consumed in the reaction. The other 90% is a waste product in gaseous form. The gaseous methanol is distilled to liquid form and returned to T-407 for reuse in the production process. The liquid methanol returns to T-407 at a very hot temperature. That heat is used, in part, to keep newly delivered, unheated methanol from T-101 and the methanol returned to T-407 at a temperature above 80 degrees Fahrenheit so that the lipid feedstock does not congeal when the components combine at the T junction.

On October 9, 2012, the Minnesota Department of Labor and Industry sent inspectors to Ever Cat's plant based on a report of an injury to an employee. The department performed a follow-up inspection on October 18, 2012, to gather more information concerning whether the plant was governed by the process safety management (PSM) requirements under federal and Minnesota law based on the amount of flammable liquids used in Ever Cat's process to create biodiesel fuel. *See* 29 C.F.R. § 1910.119; Minn. R. 5205.0010, subps. 1-2 (2015). The PSM standard establishes

3

safety requirements for managing the dangers associated with processes involving highly hazardous chemicals.

The department subsequently issued Ever Cat a citation identifying 11 items of noncompliance with the PSM requirements. Ever Cat filed a Notice of Contest and Service to Affected Employees. The department then filed a summons that Ever Cat answered.

Prior to a contested hearing before an administrative law judge (ALJ), the parties filed a pretrial stipulation to narrow the issues. The stipulation states in relevant part:

> The sole issue regarding liability for Citation 1, Items 2-7 is whether [Ever Cat's] tank, referred to as T-407, meets the exemption contained in 29 C.F.R. 1910.119(a)(1)(ii)(B). [The department] stipulates that T-407 meets the 29 C.F.R. 1910.119(b) definition of atmospheric tank. The parties summarize the issue as follows, if the materials in T-407 are included in the calculation to determine whether the flammable liquid threshold amount has been reached under 29 C.F.R. 1910.119(a)(1)(ii), then MN OSHA has proven that Citation 1, Items 2-7 apply and were violated, but if the materials in T-407 are not counted toward the threshold, then MN OSHA cannot prove that Citation 1, Items 2-7 apply, and Citation 1, Items 2-7 should be vacated.

Following a two-day hearing, the ALJ determined that the exemption under 29 C.F.R. § 1910.119(a)(1)(ii)(B) (referred to as the storage-or-transfer exemption) does not apply to T-407 and, therefore, because the contents of T-407 exceed the flammable-liquid threshold in 29 C.F.R. § 1910.119(a)(1)(ii), the PSM requirements apply. Ever Cat appealed the ALJ's decision to the MN OSHA Review Board, which affirmed the ALJ's decision, adopting the ALJ's findings and concluding that the ALJ did not err in his legal analysis. This certiorari appeal follows.

4

## DECISION

### I.

On certiorari appeal of the board's final order, we may affirm, remand, reverse, or modify "the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions" are affected by an error of law, unsupported by substantial evidence, or arbitrary or capricious. Minn. Stat. § 14.69 (2014).

"Review of a state agency's interpretation of a federal regulation that the agency is charged with enforcing and administering is a question of law that we review de novo." *In re Reichmann Land & Cattle, LLP*, 867 N.W.2d 502, 506 (Minn. 2015) (quotations omitted). In reviewing the interpretation, we first determine if the regulation is clear or ambiguous when applied in the circumstance. *Id.* To decide if a regulation is clear or ambiguous "we construe rules as a whole and interpret words and sentences in the light of [the context of the regulation at issue]." *Id.* (quotations omitted); *see also In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance for the Discharge of Treated Wastewater*, 731 N.W.2d 502, 517 (Minn. 2007) ("We have said that the meaning of a word depends on how it is being used."). If a regulation is unclear or reasonably susceptible to more than one reasonable interpretation, it is ambiguous. *Reichmann Land & Cattle*, 867 N.W.2d at 506. "If the regulation is ambiguous, we generally defer to the agency's interpretation of the regulation, if its interpretation is reasonable." *Id.* But if the regulation is unambiguous, we do not defer to the agency's interpretation and can substitute our own judgment based on the plain meaning of the regulation. *Id.*

Ever Cat argues that the board erred by determining that T-407 does not meet the storage-or-transfer exemption contained in 29 C.F.R. 1910.119(a)(1)(ii)(B). According to 29 C.F.R. § 1910.119(a)(1)(ii), the PSM requirements apply to:

> (ii) A process which involves a Category 1 flammable gas . . . or a flammable liquid with a flashpoint below 100 ºF (37.8 ºC) on site in one location, in a quantity of 10,000 pounds (4535.9 kg) or more except for:
> . . . .
> (B) Flammable liquids with a flashpoint below 100 ºF (37.8 ºC) stored in atmospheric tanks or transferred which are kept below their normal boiling point without benefit of chilling or refrigeration.

The parties agree that T-407 is part of Ever Cat's process that involves a flammable liquid (liquid methanol) with a flashpoint below 100 ºF. Further, the parties stipulated prior to the hearing before the ALJ that T-407 is an atmospheric tank under the exemption. They also agree that the liquid methanol from T-407 is kept below its normal boiling point without benefit of chilling or refrigeration. The point of disagreement is whether the methanol in T-407 is stored or transferred. 29 C.F.R. § 1910.119(a)(1)(ii)(B). If the methanol in T-407 qualifies for the exemption and is not counted toward the 10,000-pound threshold in the regulation, MN OSHA concedes that Ever Cat has not violated the PSM requirements of 29 C.F.R. § 1910.119.

Both parties assert that the regulation is unambiguous and that the plain meaning of the storage-or-transfer exemption supports their interpretation of the phrase. The regulation itself does not define the phrase "stored in atmospheric tanks or transferred." But Black's Law Dictionary defines the verb "store" as "[t]o keep (goods, etc.) in safekeeping for future delivery in an unchanged condition." *Black's Law Dictionary*

6

1646 (10th ed. 2014).  The American Heritage Dictionary defines the verb "store" as "[t]o reserve or put away for future use."  *The American Heritage Dictionary of the English Language* 1720 (5th ed. 2011).

Black's Law Dictionary defines the verb "transfer" as "[t]o convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of."  *Black's Law Dictionary* 1727 (10th ed. 2014). The American Heritage Dictionary defines the verb "transfer" as "[t]o convey or cause to pass from one place, person, or thing to another."  *The American Heritage Dictionary of the English Language* 1844 (5th ed. 2011).

Ever Cat contends that the liquid methanol is stored in T-407 because it does not go through any chemical reaction—it is kept in T-407 in an unchanged condition and reserved for future use.  Ever Cat also asserts that the continuous nature of its process should not exclude T-407 from being defined as a storage tank.  The department responds that the methanol is not kept in an unchanged condition and reserved for future use in T-407 because methanol continuously returns to T-407 as a waste product from the process and mixes with new methanol from T-101 to heat the new methanol in preparation for use in Ever Cat's biodiesel-fuel production process.  The mixed methanol exits T-407 at a constant rate into the rest of the production process.  The department also contrasts the function of T-407 with that of T-101 (a tank that both parties agree stores methanol).

The ALJ determined that the fact that methanol does not go through a chemical reaction in T-407 does not result in the conclusion that it is stored there.  The ALJ stated,

"The methanol is moving through the tank at all times, and it is actively being heated and cooled (depending on whether it is coming from the distillation tower or from T-101) for the purpose of moving on to the next step in the process." The continuous mixing and temperature manipulation of the methanol, the ALJ continued, changes the condition of the methanol that is already in use (as opposed to being reserved for future use). Ultimately, the ALJ determined that the methanol in T-407 is not stored as is contemplated by the storage-or-transfer exemption. The board adopted the ALJ's reasoning. We agree.

Contrary to Ever Cat's argument, there is no language in the storage-or-transfer exemption that dictates that flammable liquid that does not go through a chemical reaction in an atmospheric tank must be defined as stored in the tank. And a chemical reaction is not the only way for a flammable liquid to be changed. Methanol from T-101 flows continuously into T-407 and combines with recycled liquid methanol that is constantly returning from the distillation tower. The recycled methanol changes the liquid methanol coming from T-101 by heating it in the course of the production process while the liquid methanol from T-101 cools the recycled liquid methanol. Further, the methanol is in use, as opposed to being reserved for future use, when it is mixed.

Ever Cat contends in the alternative that, if T-407 does not store methanol, its function is to transfer methanol from T-101 to the rest of the production process, and, therefore, the exemption is applicable. It argues that the methanol is either stationary and stored in T-407 or moving and transferred through T-407.

8

The ALJ found that "the natural and obvious meaning of 'transfer' in the PSM context is the movement of flammable liquid from one place to another that is distinct from any movement involved in the 'use, storage, manufacturing [or] handling' of the flammable liquid." As noted, the ALJ found that because the methanol is constantly being mixed and heated or cooled in T-407, it is in use in the process and not just transferred to or from storage. The ALJ contrasted the methanol in T-407 with the methanol moving through the pipe between T-101 and T-407, finding that the methanol in that pipe is being transferred because it is only passing, unchanged, from one location to another. The ALJ concluded that Ever Cat's interpretation of the exemption "to exclude all stationary and moving flammable liquids would completely vitiate the rule."

We are persuaded that what happens to the methanol in T-407 goes beyond being transferred to or from storage. Two sources of methanol are combined and the temperature is altered. The methanol stored in T-101 is transferred to T-407. We conclude that the board did not err by determining that the methanol in T-407 does not qualify for the storage-or-transfer exemption.

## II.

Ever Cat argues that the board's decision must be reversed because it is not supported by substantial evidence. To determine if the board's decision is supported by substantial evidence, we analyze "whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record." *In re Application of Minn. Power for Auth. to Increase Rates for Elec. Serv. in Minn.*, 838 N.W.2d 747, 757 (Minn. 2013). The "relator must show that the evidence,

9

considered in its entirety, and drawing inferences in favor of the decision, is not substantial, and, therefore, does not adequately support" the department's decisions. *Cup Foods, Inc. v. City of Minneapolis*, 633 N.W.2d 557, 563 (Minn. App. 2001), *review denied* (Minn. Nov. 13, 2001). We uphold findings even if there is conflicting evidence or more than one inference to be drawn as long as there is evidence to support the decision. *Id.* at 562.

Ever Cat relies on selected testimony and isolated terminology from the cross-examination of two department employees to argue that the evidence does not support the board's affirmance of the ALJ's decision. The first employee, Douglas Poeschl, a senior engineer in the department, testified that no chemical reaction, mixing of chemicals, or blending of chemicals occurs in T-407. He also testified that liquid methanol is "held" in T-407. The second employee, Alden Hoffman, the industrial hygiene manager and member of MN OSHA's management team, testified that no chemical change occurs in T-407 and that liquid methanol "resides" in the tank.

But the fact that a chemical reaction does not occur in T-407 does not mean that the liquid methanol is stored there. Ever Cat overemphasizes the witnesses' use of the words "held" and "resides." Reading the cross-examinations in totality, Poeschl refused to agree that T-407 is used to "store" the liquid methanol. He consistently insisted on the opposite. Hoffman refused to concede that liquid methanol is "stored" in T-407 and reiterated that it is not stored based on the continuous flow of liquid methanol from T-101 to T-407 and the process, among other things. Further, as the department points out, the board (through its adoption of the ALJ's findings and reasoning) relied on the testimony

10

of Ever Cat's chief science officer that T-407 is used to continuously combine the warmer recycled liquid methanol with the cooler liquid methanol from T-101 to heat the new methanol and prepare it for the process used to create biodiesel fuel. We conclude that the board's decision is supported by substantial evidence.

### III.

Ever Cat contends that the board's decision is arbitrary and capricious. "An agency decision is arbitrary and capricious if it is an exercise of the agency's will, rather than its judgment, or if the decision is based on whim or is devoid of articulated reasons." *Cup Foods*, 633 N.W.2d at 565. If there is room for multiple opinions, an agency's choice between the opinions is not arbitrary and capricious. *Id.* Ever Cat argues that the decision is arbitrary or capricious because it is contrary to prior interpretations of the storage-and-transfer exemption by federal and Minnesota ALJs. *See Sec'y of Labor v. Meer Corp.*, 1995-1997 CCH OSHD ¶ 31,310, 1997 WL 235621 (No. 95-0341, 1997) (ALJ); *Ken B. Peterson, Comm'r, State of Minn., Dep't of Labor & Indus. v. Interplastic Corp.*, MDLI Docket No. 11-1901-21914-2, 2012 WL 6568328 (Mar. 2, 2012) (ALJ).

In *Meer*, the federal Secretary of Labor issued a citation to Meer Corporation for failure to comply with the PSM requirements. *Meer*, 1997 WL 235621, at *1. Meer Corporation agreed that its process involved more than 10,000 pounds of flammable liquids, implicating the application of the PSM requirements under 29 C.F.R. § 1910.119(a)(1)(ii). *Id.* But it argued that the storage-or-transfer exemption applied to enough flammable liquid in its process that it did not exceed the 10,000-pound threshold.

11

*Id.* The secretary argued that the exemption did not apply because the storage tanks were connected to the process. *Id.*

The ALJ determined that the secretary failed to prove that the tanks were connected to the process. *Id.* at *6, *9. Although that finding disposed of the secretary's argument, the ALJ also considered whether the storage-or-transfer exemption would have been unconstitutionally vague as applied to Meer (assuming that the secretary proved that the tanks were interconnected). *Id.* at *9-10. The ALJ stated that "the Secretary altered the exemption by adding such qualifying phrases as: 'and not connected to a process or a process vessel,' or 'unless the atmospheric tank is connected to a process.'" *Id.* at *10. The alteration and addition of language by the secretary without actually modifying the regulation to properly inform companies compelled the ALJ to conclude that the exemption was unconstitutionally vague as applied to Meer. *Id.* at *11.

A week after the *Meer* decision was released, the director of OSHA's compliance program issued a memorandum regarding "Coverage of Stored Flammables under the Process Safety Management Standard." *Interplastic*, 2012 WL 6568328, at *7. The director stated in the memorandum:

> Until the [exemption] is revised . . . OSHA will abide by the *Meer* decision, and will not cite 1910.119 under circumstances when coverage of the process would be based partly or solely on the quantity of flammable liquid in connected atmospheric storage tanks, that would otherwise qualify for the 1910.119(a)(1)(ii)(B) exemption.

*Id.* OSHA has not amended the storage-or-transfer exemption since 1997. *Id.* at *8.

12

In July 2000, MN OSHA amended its compliance instructions to specifically address the coverage of flammable liquids implicating the PSM requirements. *Id.* It made two more amendments to the instructions in 2005 and 2009. *Id.* Included in its 2000, 2005, and 2009 amendments are conditions for a flammable liquid to be considered "stored" in an atmospheric tank under the exemption. *Id.* at *8-9. The conditions require that the tank not be connected to the process—language that is contrary to the memorandum from the director and the ALJ's decision in *Meer.* *Id.* at *9.

Following its compliance instructions, the department cited Interplastic Corporation in 2010 based on the aggregate volume of flammable liquid stored in eight separate atmospheric storage tanks connected to the company's process. *Id.* at *3. Interplastic challenged the citation. *Id.* at *5. It argued that the storage-or-transfer exemption is unconstitutionally vague and indefinite as applied to its facility and that MN OSHA engaged in unauthorized rulemaking when it amended the instructions pertaining to the storage-or-transfer exemption. *Id.*

The ALJ agreed, finding the void-for-vagueness analysis from *Meer* compelling. *Id.* at *12. The ALJ reasoned that MN OSHA added qualifying language that specified "flammable liquids cannot be considered to be 'stored' in atmospheric tanks if the tank is 'connected to a process.'" *Id.* The qualifying language made the storage-or-transfer exemption unconstitutionally vague as applied to *Interplastic*. *Id.* at *12. And the ALJ concluded that MN OSHA engaged in unauthorized rulemaking by issuing the compliance instructions clarifying its position on "stored" flammable liquids. *Id.* at *14.

13

In contrast to *Meer* and *Interplastic*, the department here did not define the liquid methanol in T-407 as "stored" because it is connected to the process. It determined that the exemption does not apply to T-407 because of the constant mixing of hot recycled liquid methanol with unheated liquid methanol from T-101, which prepares the methanol for use in Ever Cat's biodiesel-fuel production process. The department followed the *Meer* and *Interplastic* decisions by defining the liquid methanol in T-101 as "stored" for purposes of the exemption. It did not argue that the liquid methanol in T-101 is not stored because it is piped to T-407 and therefore part of the process. We conclude that the board's decision is not arbitrary or capricious.

## IV.

Ever Cat argues that the storage-or-transfer exemption is unconstitutionally vague as applied to T-407. The ALJ determined that Ever Cat waived any argument pertaining to whether the regulation is unconstitutional, and the board affirmed. On appeal, the department again contends that Ever Cat waived its void-for-vagueness challenge.

A party is bound by a stipulation of the issues before a decision-maker unless it is released from that stipulation. *Atl. Mut. Ins. Co. v. Judd Co.*, 380 N.W.2d 122, 124 (Minn. 1986) (citing *Pampusch v. Nat'l Council of Knights & Ladies of Sec.*, 145 Minn. 71, 72, 176 N.W. 158, 158 (1920) ("A stipulation made by a party in the trial of a cause, unless he is relieved from it, is binding upon him.")). Ever Cat stipulated that whether T-407 meets the storage-or-transfer exemption was the "sole issue regarding liability."

We therefore conclude that Ever Cat has waived its void-for-vagueness challenge and do not address it.

**Affirmed.**