**In the Matter of a Petition by EXCELSIOR ENERGY INC. for Approval of a Power Purchase Agreement Under Minn. Stat. 216B.1694, Determination of Least Cost Technology, and Establishment of a Clean Energy Technology Minimum Under Minn. Stat. 216B.1693.**

No. A09–1441.

Court of Appeals of Minnesota.

May 18, 2010.

Byron E. Starns, Jr., Brian M. Meloy, Leonard, Street and Deinard, Minneapolis, MN; and Thomas L. Osteraas, Excelsior Energy, Minnetonka, MN, for relator Excelsior Energy and MEP–I, LLC.

Lori Swanson, Attorney General, Alison C. Archer, Anna Elizabeth Jenks, Assistant Attorneys General, St. Paul, MN, for respondent Minnesota Public · Utilities Commission.

Michael C. Krikava, Zeviel T. Simpser, Briggs and Morgan, Minneapolis, MN; and Christopher B. Clark, Mara N. Koeller, Xcel Energy Services, Minneapolis, MN, for respondent Northern States Power Co.

David Moeller, Duluth, MN, for respondent Minnesota Power.

Considered and decided by CONNOLLY, Presiding Judge; HUDSON, Judge; and JOHNSON, Judge.

## OPINION

HUDSON, Judge.

In this certiorari appeal, relator Excelsior Energy Inc. challenges the decision of the Minnesota Public Utilities Commission that its proposed power-purchase agreement with Northern States Power, d/b/a Xcel Energy Services Inc., is not in the public interest under Minn.Stat. § 216B.1694, subd. 2(a)(7). By notice of review, respondent Minnesota Power seeks reversal of the commission's determination that Excelsior's project qualifies as an innovative energy project (IEP) under Minn. Stat. § 216B.1694, subd. 1 (2008). Be-

cause we conclude that the commission did not exceed its statutory power and that its determinations were supported by substantial record evidence and were not arbitrary and capricious, we affirm.

## FACTS

Relator Excelsior Energy, Inc. is an independent energy development company based in Minnetonka. Excelsior Energy Inc., and its subsidiary MEP–I, LLC (jointly Excelsior), propose to license, construct, own, and operate the Mesaba Energy Project Units 1 and 2 (the Mesaba project). Both units would be integrated gasification combined cycle (IGCC) power plants, constructed to approximately the same specifications, each with an initial capacity of 603 megawatts. The Mesaba project would be located on the Iron Range, either in Iron Range Township northeast of Grand Rapids or in Hoyt Lakes. Both units 1 and 2 would be located on the same site.

Respondent Minnesota Public Utilities Commission (the commission) is a statutorily created agency with legislative and quasi-judicial functions. *See* Minn.Stat. § 216A.05 (2008). The commission is empowered to investigate, hold hearings, prescribe rules, and make orders with respect to the control and conduct of businesses coming within its jurisdiction as the legislature authorizes. *Id.* The commission has jurisdiction over public utilities pursuant to Minn.Stat. § 216B.08 (2008).

Respondent Northern States Power Company, d/b/a Xcel Energy Services Inc. (Xcel), is a public utility engaged primarily in the business of generating, transmitting, and distributing electrical power and energy in Minnesota and nearby states. Xcel owns both nuclear generation facilities currently located in Minnesota. As of 2002, Xcel provided service to slightly more than half of Minnesota's almost two million non-farm residential electric customers and an even higher percentage of Minnesota's commercial electric customers. Its service areas cover a large part of the southern half of Minnesota.

Respondent Minnesota Power is a public utility based in Duluth that provides electricity in a 26,000–square–mile service area in northeastern Minnesota. Minnesota Power petitioned to intervene in this case because it is a potential purchaser of the energy the Mesaba project would produce. In addition, the approval of the Mesaba project would result in policy and economic implications for the state transmission grid that would significantly affect Minnesota Power's transmission control area.

*The legislature enacts clean energy statutes*

The Minnesota legislature enacted both the clean energy technology (CET) statute, Minn.Stat. § 216B.1693, and the IEP statute, Minn.Stat. § 216B.1694, in its 2003 special session as part of the 2003 omnibus energy bill. *See* 2003 Minn. Laws 1st Spec. Sess. ch. 11, art. 2, § 4, at 1668; art. 4, § 1, at 1689–90. The statutes provide regulatory incentives for certain innovations in energy production in the state. The interpretation of the IEP statute is a matter of first impression for this court and forms the crux of this appeal. The statute provides, in relevant part:

**Subdivision 1. Definition.** For the purposes of this section, the term "innovative energy project" means a proposed energy-generation facility or group of facilities which may be located on up to three sites:

(1) that makes use of an innovative generation technology utilizing coal as a primary fuel in a highly efficient combined-cycle configuration with significantly reduced sulfur dioxide, nitrogen oxide, particulate, and mercury emis-

sions from those of traditional technologies;

(2) that the project developer or owner certifies is a project capable of offering a long-term supply contract at a hedged, predictable cost; and

(3) that is designated by the commissioner of the Iron Range Resources and Rehabilitation Board as a project that is located in the taconite tax relief area on a site that has substantial real property with adequate infrastructure to support new or expanded development and that has received prior financial and other support from the board.

**Subd. 2. Regulatory incentives.** (a) An innovative energy project:

(1) is exempted from the requirements for a certificate of need under section 216B.243, for the generation facilities, and transmission infrastructure associated with the generation facilities, but is subject to all applicable environmental review and permitting procedures of chapter 216E;

. . . .

(4) shall qualify as a "clean energy technology" as defined in section 216B.1693;

(5) shall, prior to the approval by the commission of any arrangement to build or expand a fossil-fuel-fired generation facility, or to enter into an agreement to purchase capacity or energy from such a facility for a term exceeding five years, be considered as a supply option for the generation facility, and the commission shall ensure such consideration and take any action with respect to such supply proposal that it deems to be in the best interest of ratepayers;

. . . .

(7) shall be entitled to enter into a contract with a public utility that owns a nuclear generation facility in the state to provide 450 megawatts of baseload capacity and energy under a long-term contract, subject to the approval of the terms and conditions of the contract by the commission. The commission may approve, disapprove, amend, or modify the contract in making its public interest determination, taking into consideration the project's economic development benefits to the state; the use of abundant domestic fuel sources; the stability of the price of the output from the project; the project's potential to contribute to a transition to hydrogen as a fuel resource; and the emissions reductions achieved compared to other solid fuel baseload technologies[.]

Minn.Stat. § 216B.1694.

*Mesaba's power-purchase agreement*

The IEP and CET statutes create a regulatory structure for the construction of a clean-coal power plant on the Iron Range. Once a project is determined to be an IEP, it becomes eligible for the regulatory incentives contained in the statute. It is undisputed that the 2003 legislation was designed to advance the integrated gasification combined cycle (IGCC) generation facility being designed by Excelsior. IGCC is a new, "clean coal" technology designed to produce lower emissions than standard coal-fired generation by transforming coal to a gas before combustion. The technology is being widely examined, not just for its environmental effects, but for its potential to reduce dependence on foreign petroleum supplies by tapping domestic coal supplies.

Lengthy negotiations between Excelsior and Xcel were unable to produce a mutually satisfactory power-purchase agreement (PPA). As a result, in late December 2005, Excelsior unilaterally asked the commission to approve a PPA between it and Xcel. The proposed PPA would require Xcel, by 2013, to purchase 13% of its retail

load from the Mesaba project; this would amount to roughly the entire 603–megawatt (MW) output of the facility.

*The commission's evaluation of the PPA*

The commission issued an order on April 25, 2006, finding that it had jurisdiction over the petition under Minn.Stat. §§ 216B.1693 and .1694, and referring the matter for a contested case proceeding. The order directed the administrative law judges (ALJs) to consider whether the commission should

> (1) approve, disapprove, amend, or modify the terms and conditions of a proposed power purchase agreement that Excelsior has submitted to Xcel Energy under Minn.Stat. § 216B.1694;
>
> (2) determine that the coal-fueled [IGCC] power plant that Excelsior plans to construct in northern Minnesota is, or is likely to be, a least-cost resource, obligating Xcel to use the plant's generation for at least two percent of the energy supplied to its retail customers, under Minn.Stat. § 216B.1693; and [/or]
>
> (3) determine that, under the terms of Minn.Stat. § 216B.1693, at least 13% of the energy supplied to Xcel's retail customers should come from the IGCC plant by 2013.

The proceedings were later bifurcated, so that Phase I considered issues one and two, and Phase II considered the third issue.

Two ALJs jointly presided over Phase I. The ALJs found that the Mesaba project was not an IEP, recommended that the commission deny the PPA in its entirety as against the public interest, and concluded that the Mesaba project was not likely to be a least-cost resource.

The commission's Phase I order adopted most of the ALJs' public-interest and cost findings. But contrary to the ALJs' rec-ommendation, the commission found that the Mesaba project was an IEP.

One ALJ presided over Phase II and addressed the narrow issue of whether Excelsior was entitled to a PPA in which Xcel purchased 13% of its energy from Excelsior. In his findings, conclusions, and order, the ALJ concluded that, because nothing had changed since the Phase I hearing to change the finding that the Mesaba project was not likely to be a least-cost resource, it would be contrary to the public interest to allow Excelsior to supply 13% of Xcel's energy by 2013. In its Phase II order, the commission agreed.

The commission denied Excelsior's motion for reconsideration, denied its motions to supplement the record and to suspend proceedings, and closed the docket. This appeal follows.

Excelsior contends that the commission exceeded its authority under the IEP and CET statutes and that the commission's findings are arbitrary and capricious and are not supported by substantial evidence. By notice of review, respondent Minnesota Power contests the commission's finding that the Mesaba project meets the statutory criteria for an IEP.

## ISSUES

I. Did the commission err in determining that the Mesaba project is an IEP under Minn.Stat. § 216B.1694, subd. 1?

II. Does Minn.Stat. § 216B.1694, subd. 2(a)(7), require the commission to undertake its traditional public-interest evaluation?

III. Was the commission's application of the IEP statute to Excelsior's PPA arbitrary and capricious or unsupported by substantial evidence?

## ANALYSIS

■■■ Decisions by administrative agencies enjoy a presumption of correctness, and this court shows deference to an agency's expertise and its special knowledge in its own technical field. *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn.2001). The standard of review is not heightened when the final decision of the agency decision-maker differs from the recommendation of the ALJ, but a rejection of the ALJ's recommendation without explanation may indicate arbitrary action. *Id.*

■■■ Our review of agency decisions is governed by Minn.Stat. § 14.69 (2008). *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 660 N.W.2d 427, 433 (Minn.App.2003). This court

may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

 (a) in violation of constitutional provisions; or

 (b) in excess of the statutory authority or jurisdiction of the agency; or

 (c) made upon unlawful procedure; or

 (d) affected by other error of law; or

 (e) unsupported by substantial evidence in view of the entire record as submitted; or

 (f) arbitrary or capricious.

Minn.Stat. § 14.69. The relator has the burden of proof when appealing an agency decision. *Ctr. for Envtl. Advocacy*, 660 N.W.2d at 433.

*Statutory authority*

■■■ As a creature of statute, the commission has only the powers provided by the legislature. *Peoples Natural Gas Co. v. Minn. Pub. Utils. Comm'n*, 369 N.W.2d 530, 534 (Minn.1985). The determination of whether the commission has the statutory authority to act raises a question of law, which is subject to de novo review. *Minnegasco v. Minn. Pub. Utils. Comm'n*, 549 N.W.2d 904, 907 (Minn.1996).

[E]xpress statutory authority need not be given a cramped reading, [but] any enlargement of express powers by implication must be fairly drawn and fairly evident from the agency objectives and powers expressly given by the legislature. Neither agencies nor courts may under the guise of statutory interpretation enlarge the agency's powers beyond that which was contemplated by the legislative body.

*Peoples Natural Gas*, 369 N.W.2d at 534 (quotation omitted). Any reasonable doubt about the existence of a power in the commission should be resolved against the exercise of such power. *In re Petition of Minn. Power*, 545 N.W.2d 49, 51 (Minn.App.1996).

■■■ On matters of statutory interpretation, this court is not bound by agency determinations. *Arvig Tel. Co. v. Nw. Bell Tel. Co.*, 270 N.W.2d 111, 114 (Minn. 1978). "The manner in which the agency has construed a statute may be entitled to some weight, however, where (1) the statutory language is technical in nature, and (2) the agency's interpretation is one of longstanding application." *Id.*

■■■ The aim of statutory interpretation is to ascertain and effectuate the intent of the legislature. Minn.Stat. § 645.16 (2008). "When interpreting a statute, we look first to see whether the statute's language, on its face, is clear or ambiguous. A statute is only ambiguous when the language therein is subject to more than one reasonable interpretation."

*Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000) (quotations and citation omitted). Where a statute is ambiguous, we employ other canons of construction to discern the legislature's intent. *Gomon v. Northland Family Physicians, Ltd.,* 645 N.W.2d 413, 416 (Minn. 2002). In doing so, "we apply principles of statutory construction in conjunction with a searching examination of the entire text." *In re Detailing Criteria,* 700 N.W.2d 533, 536 (Minn.App.2005).

*Substantial evidence*

▇▇▇▇▇ "With respect to factual findings made by the agency in its judicial capacity, if the record contains substantial evidence supporting a factual finding, the agency's decision must be affirmed." *In re Minn. Dep't of Commerce for Comm'n Action Against AT & T,* 759 N.W.2d 242, 246 (Minn.App.2009) (quotation omitted). The substantial evidence test is a "quantitative evidentiary test," which requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Minn. Power & Light Co. v. Minn. Pub. Utils. Comm'n,* 342 N.W.2d 324, 328 (Minn.1983) (quotation omitted). The following principles apply:

(1) unless manifestly unjust, inferences must be accepted even though it may appear that contrary inferences would be better supported; (2) a substantial judicial deference [is to be accorded] to the fact finding process of the administrative agency; and (3) the burden is upon the appellant to establish that the findings of the agency are not supported by the evidence in the record, considered in its entirety.

*In re Blue Cross & Blue Shield,* 624 N.W.2d at 279 (quotation omitted).

*Arbitrary and capricious*

▇▇▇▇▇ The decision of the commission is arbitrary and capricious if it represents the will of the agency and not its judgment. *Peoples Natural Gas Co. v. Minn. Pub. Utils. Comm'n,* 342 N.W.2d 348, 351 (Minn.App.1983), *review denied* (Minn. Apr. 24, 1984). The ruling is arbitrary and capricious if the decision-maker:

(a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise.

*In re N. States Power Co.,* 775 N.W.2d 652, 658 (Minn.App.2009). The decision is not arbitrary and capricious if there is room for more than one opinion, even if the reviewing court might have reached a different conclusion. *Id.*

## I

Minnesota Power challenges the commission's determination that the Mesaba project qualifies as an IEP under Minn. Stat. § 216B.1694, subd. 1. We consider this issue first because Excelsior only has grounds for its appeal if the project qualifies as an IEP.

An IEP is a proposed energy facility

(1) that makes use of an innovative generation technology utilizing coal as a primary fuel in a highly efficient combined-cycle configuration with significantly reduced sulfur dioxide, nitrogen oxide, particulate, and mercury emissions from those of traditional technologies;

(2) that the project developer or owner certifies is a project capable of offering a long-term supply contract at a hedged, predictable cost; and

(3) that is designated by the commissioner of the Iron Range Resources and Rehabilitation Board as a project that is

located in the taconite tax relief area. . . .

Minn.Stat. § 216B.1694, subd. 1.

The ALJs found that the Mesaba project is not an IEP under Minn.Stat. § 216B.1694 because it met only two of the statutory requirements: it was capable of offering a hedged and predictable cost and it had been appropriately certified by the Iron Range Rehabilitation Board. But with respect to the first statutory requirement, the ALJs determined that the proposed power purchase agreement did not contain any guarantees that the Mesaba project would use coal as a primary fuel, and that it was, in fact, designed to use natural gas and other solid materials. The ALJs were also concerned that the Mesaba project would not significantly reduce two of the four listed emissions in comparison to other plants.

The commission found, contrary to the ALJs' recommendations, that the Mesaba project is an IEP for two reasons. First, the commission found that the Mesaba project will use coal as a primary fuel. "A primary fuel," stated the commission, does not need to be a fuel used more than 50% of the time, but only one that is "an essential component." In addition, the commission determined that the record "does not support the fear that coal will constitute anything other than a very substantial portion of the solid fuel used by the plant."

Second, the commission disagreed with the ALJs' definition of the term "traditional technologies" in Minn.Stat. § 216B.1694, subd. 1(1), as well as the ALJs' conclusion that the Mesaba plant would not significantly reduce emissions. The commission defined the phrase "traditional technologies" to include older, currently operating coal plants, not just the state-of-the-art

coal plants used as comparisons by the ALJs. The commission concluded that, when this comparison was made, the Mesaba project would significantly reduce emissions.

Adopting the ALJs' findings that the Mesaba project could provide a hedged cost and that the Iron Range Rehabilitation Board had certified the project, the commission declared that the Mesaba project was an IEP under Minn.Stat. § 216B.1694, subd. 1.

On appeal, Minnesota Power argues that substantial evidence does not support two of the commission's findings: that the Mesaba project will significantly reduce emissions compared to traditional technologies; and that the Mesaba project can provide a hedged, predictable cost.

*Significantly reduces emissions*

Minnesota Power argues that the commission incorrectly rejected the ALJ's findings that the Mesaba project would not significantly reduce emissions because: (1) the Mesaba project's emission profile would not be significantly lower than either a modern supercritical pulverized coal unit or Minnesota Power's Boswell Energy Center Unit 3, when retrofitted,[1] and (2) the statute requires that an IEP significantly reduce all four emissions.

Minnesota Power's argument is primarily an objection to the commission's interpretation of the statute. The commission found that the term "traditional technologies" in Minn.Stat. § 216B.1694, subd. 1(1), is undefined, but concluded that the term must include currently operating coal plants, as well as coal plants with state-of-the-art emissions controls and "generic" coal plants of the future. Minnesota Power argues that the Mesaba project's emissions should be compared

---

1. As of the date of the administrative hearing, the Boswell 3 retrofit was a proposal but not yet in existence. The retrofit has now been completed.

only to supercritical pulverized coal plants and other updated technologies, and it argues that the Mesaba project should not have the benefit of comparison to older, existing technologies. But the commission's interpretation of the phrase "traditional technologies" to include older plants currently in operation comports with the plain language of the statute, as "traditional" is a backward-looking, and not a forward-looking, term. In addition, because energy-generating technologies are within the commission's area of expertise, we give deference to its definition. *See Arvig Tel. Co.*, 270 N.W.2d at 114.

■ Minnesota Power also contends the phrase "significantly reduced" emissions is ambiguous. The statute identifies four emissions that must be significantly reduced, but the term "significant" is not defined. The ALJs read the statute to mean that all four emissions should be significantly reduced. The commission, by contrast, did not settle on a reading of this term. Instead, once it decided that the comparison to traditional technologies included the existing fleet of coal-fired plants, the commission concluded that the Mesaba project significantly reduced emissions when compared individually or in aggregate with emissions from these coal-fired plants.

Based on our review of the record, and in deference to the commission's expertise, we conclude that there is substantial evidence to support the commission's finding that the Mesaba project significantly reduces emissions in comparison to existing plants, whether the pollutants are considered individually or in aggregate.

*Hedged, predictable cost*

■ Minnesota Power also argues that the Mesaba project is not capable of providing energy at a hedged, predictable cost because it has no existing fuel or transportation contracts to hedge against future cost increases. Primarily, it disagrees with the ALJ's findings that even though Excelsior cannot currently provide energy at a hedged, predictable cost because it does not have any negotiated contracts, "Excelsior Energy is certainly capable of negotiating a portfolio of agreements of varying terms so that its fuel costs would be hedged, and relatively predictable and stable." Minnesota Power's argument again combines statutory interpretation and factual questions. To be "capable" of something, Minnesota Power argues, a facility needs an established track record, and the record does not demonstrate that Excelsior has such a track record or that it will even be ready to begin such contract negotiations for another three or four years.

In response, respondent commission contends that the IEP statute "does not require that a hedged and predictable cost be offered today," but only that Mesaba have the "capability of doing so" under the terms of the PPA. Without directly defining capability, the commission points to the ALJs' finding that 80% of Xcel's total monthly payment will be fixed. The fuel cost, on which Minnesota Power bases its argument, represents only 20% of the monthly payment in the PPA. Even though that 20% is not hedged or predictable now, the ALJs and the commission found that Excelsior is capable of entering into long-term fuel contracts that could provide a hedged, predictable cost.

This factual finding is based on the ALJs' consideration of the PPA, the parties' arguments, coal prices, and analyses by fuels experts. For this reason, we conclude that the commission's finding that the Mesaba project is capable of providing a hedged, predictable cost is supported by substantial record evidence.

Overall, the ALJs engaged in a thorough discussion of the statutory requirements for an IEP, and the commission reviewed these findings thoroughly and modified some as appropriate. We defer to the commission's interpretation of "traditional technologies" and conclude that the commission's finding that the Mesaba project is an IEP is supported by substantial evidence in the record.

## II

Excelsior maintains that the commission erred by undertaking its traditional public-interest evaluation in evaluating the PPA. As outlined by statute, "[a]n innovative energy project" . . .

(1) is exempted from the requirements for a certificate of need under section 216B.243, for the generation facilities, and transmission infrastructure associated with the generation facilities, but is subject to all applicable environmental review and permitting procedures of chapter 216E;

. . . .

(5) shall, prior to the approval by the commission of any arrangement to build or expand a fossil-fuel-fired generation facility . . . be considered as a supply option for the generation facility, and the commission shall ensure such consideration and take any action with respect to such supply proposal that it deems to be in the best interest of ratepayers;

. . . .

(7) shall be entitled to enter into a contract with a public utility that owns a nuclear generation facility in the state to provide 450 megawatts of baseload capacity and energy under a long-term contract, subject to the approval of the terms and conditions of the contract by the commission. *The commission may approve, disapprove, amend, or modify the contract in making its public inter-*

*est determination, taking into consideration the project's economic development benefits to the state; the use of abundant domestic fuel sources; the stability of the price of the output from the project; the project's potential to contribute to a transition to hydrogen as a fuel resource; and the emissions reductions achieved compared to other solid fuel baseload technologies[.]*

Minn.Stat. § 216B.1694, subd. 2(a)(1), (5), (7) (emphasis added).

*Commission findings*

In their Phase I report and recommendations, the ALJs concluded that the PPA is not in the public interest, "as required by Minn.Stat. § 216B.1694, subd. 2(a)(7)," and that the final PPA should be denied. The ALJs recognized that Excelsior Energy is not a public utility under Chapter 216B; consequently, it is not regulated by the commission. They reasoned, however, that because section 216B.1694, subdivision 2(a)(7), lists factors for the commission to consider "in making its public interest determination," and because the commission is statutorily required to consider the public interest in evaluating Xcel and its energy contracts, a broad public-interest evaluation was called for. In addition, "[b]ecause Excelsior Energy is not regulated by the Commission, the PPA is the only vehicle available to ensure performance of the Project and reasonableness of rates paid by Xcel Energy's ratepayers."

Accordingly, the ALJs evaluated the PPA in terms of:

The [Mesaba] Project's economic development benefits to the state;

The Project's use of abundant domestic fuel sources;

The stability of the price of the Project's output;

The Project's potential to contribute to a transition to hydrogen as a fuel resource;

The Project's emission reductions achieved compared to other solid fuel baseload technologies;

The protection of ratepayers from financial risks associated with the PPA;

The protection of ratepayers from indirect financial costs caused by the PPA's impact on Xcel Energy's financial health; and

The reasonableness of the cost of the PPA.

The first five of these are the statutory factors listed in Minn.Stat. § 216B.1694, subd. 2(a)(7). The last three are public-interest criteria used by the Minnesota Department of Commerce (DOC) to analyze PPAs for the commission. Whether the commission was authorized to consider these final three criteria is at the heart of this dispute.

The commission agreed with the ALJs' analysis. The commission considered itself bound by its "normal statutory obligations" to regulate public utilities in the public interest under Minn.Stat. §§ 216B.01, .03 (2008). The commission noted that, in addition to these normal statutory obligations, it "is also required to consider the five factors set forth above [in Minn.Stat. § 216B.1694, subd. 2(a)(7) ], due to the unique characteristics and potential advantages of IGCC technology." Thus, in making its public-interest determination, the commission considered the five specific statutory factors, as well as the three, broader public-interest criteria used by the DOC to analyze PPAs for the commission.

*Minn.Stat. § 216B.1694, subd. 2(a)(7)*

Subdivision 2(a)(7) speaks most clearly to the standard to be used when evaluating an IEP's PPA. The parties' arguments center around this subdivision, and specifi-

cally on the interpretation of the phrase "in making its public interest determination." Minn.Stat. § 216B.1694, subd. 2(a)(7). Excelsior argues that the phrase "its public interest determination" in (2)(a)(7) is limited by the "statute's fundamental purpose to encourage the rapid commercialization of the IGCC technology" and by the "five and only five factors" listed in the statute.

In response, the commission asserts that the plain language of subdivision 2(a)(7) requires a comprehensive public-interest evaluation of the PPA. The commission asserts that the possessive in the phrase— "*its* public interest determination"—refers to the commission's standard public-interest determination and that the phrase would be rendered meaningless if interpreted otherwise. *Id.* (emphasis added). In addition, the commission argues that its statutory mandate to regulate public utilities such as Xcel broadens the public-interest determination under the IEP statute.

■■ We agree with the commission and conclude that the plain language of the statute is unambiguous, and that the statute requires the commission to undertake *its* traditional public-interest determination, in addition to considering the five factors listed in the statute. We first note that the statute contains no language limiting the public-interest evaluation. The five listed criteria are not limitations or a definition; rather, the phrase "taking into consideration" indicates that the criteria are additional considerations. *Id.* In addition, subdivision 2(a)(7) makes approval of the PPA expressly "subject to the approval of the terms and conditions of the contract by the commission." *Id.* This phrase supports a broader reading of the public-interest evaluation required by the statute in that an evaluation of the terms and conditions of the PPA undoubtedly requires an evaluation of cost and risk

shifting, such as the commission undertook here.

*Minn.Stat. § 216B.1694, subd. 2(a)(1)*

Excelsior also argues that the commission erred by considering Xcel's projected need for the energy. Excelsior points to Minn.Stat. § 216B.1694, subd. 2(a)(1), which exempts an IEP from the requirements for a certificate of need. This exemption, Excelsior argues, prevents the commission from applying any of the twelve factors used in a certificate-of-need evaluation under Minn.Stat. § 216B.243 (2008), and therefore prohibits the commission from considering the need for the energy produced by, or the cost of, the Mesaba project. Specifically, Excelsior objects to the commission's consideration of Excel's future need for energy on the ground that "the accuracy of the long-range energy demand forecasts on which the need for the facility is based" is a required consideration in a certificate-of-need evaluation. Minn.Stat. § 216B.243, subd. 3(1).

 The commission asserts that the approval of the PPA and the certificate-of-need evaluation are separate provisions and do not relate to each other or overlap. We agree with the commission that the scope of subdivision 2(a)(1) is more limited than Excelsior contends. The certificate-of-need evaluation applies only to *proposals* to construct large energy facilities. Minn.Stat. § 216B.243, subd. 2 ("No large energy facility shall be *sited or constructed* in Minnesota without the issuance of a certificate of need.") (emphasis added). The certificate of need has no bearing on a large energy facility's contractual agreements.

In addition, we note that the commission did not apply the certificate-of-need evaluation to Excelsior's PPA; it applied the public-interest factors traditionally applied to PPAs, which are separate and distinct from the certificate-of-need criteria. The commission considered Xcel's need for energy only in terms of the impact that demand for energy would have on cost and the price charged to ratepayers, not in terms of whether the Mesaba project should be constructed.

*Minn.Stat. § 216B.1694, subd. 2(a)(5)*

 Excelsior next argues that the commission erred in finding that "the public interest requires it to explore the potential for a statewide market for the power produced by the Mesaba project, as anticipated under Minn.Stat. § 216B.1694, subd. 2(a)(5)."

Excelsior argues that this finding demonstrates that the commission "would not approve a PPA solely between the Mesaba Project and Xcel ... notwithstanding the provisions of the IEP statute to the contrary." Excelsior asserts that the commission has thereby rejected the IEP statute's requirement that "Xcel alone purchase the output of the Mesaba Project under a long term contract."

The plain language of the statute contradicts Excelsior's argument. The plain language of subdivision 2(a)(5) anticipates that the commission will attempt to acquire other purchasers for the power output of the Mesaba project. Minn.Stat. § 216B.1694, subd. 2(a)(5). In addition, the Mesaba project currently is predicted to have an output of 603 MW; because the 450–MW capacity listed in subdivision 2(a)(7) is not a limit on the output of the project, the statute does not anticipate or require that "Xcel alone purchase the output of the Mesaba Project."

For all of the reasons stated above, we conclude that Minn.Stat. § 216B.1694, subd. 2, required the commission to undertake its traditional public-interest determi-

nation, in addition to considering the five specifically enumerated factors.

## III

Excelsior argues in the alternative that if the commission is statutorily permitted to consider the public interest, the commission abused its discretion by reconsidering the Mesaba project's location on the Iron Range. Excelsior also asserts that there was not a sufficient factual basis to compare costs when evaluating the PPA.

Excelsior's argument that the commission erred in considering the project's location may be quickly set aside. Excelsior does not allege that the commissioners' discussion of location affected the commission's final decision in any way. Rather, Excelsior objects to comments made by individual commissioners disagreeing with the Mesaba project's location. But the commission does not speak through deliberations of the commissioners; it speaks only through written orders. *See* Minn. Stat. § 216B.33 (2008) (stating that all orders of the commission must be in writing). Notably, the final order in this case does not dispute, contradict, or alter the statutory requirement that the IEP be located in the taconite tax-relief area. The commissioners need to be able to voice their opinions during deliberations, and any discussion they may have had concerning the location of the Mesaba project does not constitute error.

■ Excelsior next argues that the commission's comparative-cost findings are unsupported by substantial evidence in the record. The commission based its cost findings on reports in the record from the DOC's expert witness. Excelsior argues that the commission erred in relying on the DOC's calculations because (1) they lacked foundation; (2) the commission ignored the credible evidence presented by Excelsior's expert; (3) the DOC's expert relied on cost estimates for a new pulverized coal plant in Colorado and a potential new pulverized coal plant in Minnesota (Sherco 4); and (4) none of the other utilities involved in the hearing provided cost data.

Xcel argues that all parties stipulated to the admission of pre-filed testimony and that Excelsior stipulated to foundation and waived any foundational objections on appeal. Having reviewed the record, we conclude that the stipulation waived oral argument and cross-examination, but not objections to the evidence. In fact, Excelsior objected vigorously to the foundation for the commission's findings during the administrative process.

The commission carefully considered Excelsior's concerns about foundation, and determined that the DOC's estimates were more credible because the figures "have a broader factual foundation" and "reflect a broader range and greater depth of expertise." There is support in the record for the commission's determination, and we defer to its expertise in reading and evaluating the competing expert reports on cost projections.

The remainder of Excelsior's objections go to the credibility of the testimony and the weight given to it by the commission. On review of an administrative agency decision, we do not re-try the facts or make credibility determinations. *In re Appeal of Rocheleau*, 686 N.W.2d 882, 891 (Minn. App.2004), *review denied* (Minn. Dec. 22, 2004). The only question is whether the commission's decision is supported by substantial evidence in the record or whether it is arbitrary and capricious. Here the commission fully explained its decision and based it on reports in the record from the DOC.

Excelsior urges us, nevertheless, to look at a particular comparison by the DOC's

own expert that shows that when the net present value of a hypothetical new, supercritical, pulverized coal plant is compared to the Mesaba project's base costs, the costs of the Mesaba project is less. The DOC did consider this data and submitted an analysis of it to the commission. The DOC explained that this single comparison did not change its final conclusions on cost because the determination that the Mesaba project is not likely to be a least-cost resource is based on comparisons of the costs of the proposed PPA with Big Stone II and Sherco 4.

On this record, we conclude that the commission's cost comparisons are supported by substantial evidence and are not arbitrary and capricious.

## DECISION

We defer to the commission's expertise as to the definition of the technical term "traditional technologies." The commission's decision that the Mesaba project is an IEP is supported by substantial evidence.

The commission has the statutory authority to consider the public interest in evaluating the terms and conditions of an IEP's PPA. Its decisions in this regard are supported by substantial record evidence and are not arbitrary and capricious. Accordingly, the commission did not err in concluding that Excelsior's proposed power-purchase agreement with Xcel is not in the public interest under Minn.Stat. § 216B.1694, subd. 2(a)(7).

**Affirmed.**