**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0678**

In the Matter of the Correction Orders
Issued to the Wealshire of Bloomington.

**Filed February 14, 2024**
**Affirmed**
**Connolly, Judge**

Minnesota Department of Health
File No. 5-0900-37951

John P. Brendel, Brendel and Zinn, Ltd., St. Paul, Minnesota (for relator the Wealshire of Bloomington)

Keith Ellison, Attorney General, Kevin Jonassen, Assistant Attorney General, St. Paul, Minnesota (for respondent department of health)

Considered and decided by Connolly, Presiding Judge; Reyes, Judge; and Hooten, Judge.*

**SYLLABUS**

An assisted living facility, as defined under Minn. Stat. § 144G.08, subd. 7 (2022), is not relieved of its obligations to a resident under Minnesota Statutes chapter 144G when a hospice provider, as defined in Minn. Stat. § 144A.75, subd. 5 (2022), begins providing hospice services to that resident.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**OPINION**

**CONNOLLY**, Judge

In this certiorari appeal, relator challenges the commissioner's determination that relator violated both Minn. Stat. § 144G.91, subd. 4 (2022), by failing to provide appropriate care to a resident; and Minn. Stat. § 144G.91, subd. 8 (2022), by committing maltreatment under Minn. Stat. § 626.5572, subds. 15, 17 (2022). We affirm.

**FACTS**

Relator, The Wealshire Bloomington,[1] operates an assisted-living facility pursuant to a license issued by respondent Minnesota Department of Health. In March 2019, A.A.—a vulnerable adult—was seen twice in an emergency room: first, after falling three times in one hour, and second, after falling and lacerating her knee. *See* Minn. Stat. § 626.5572, subd. 21(a) (2022) (defining "vulnerable adult"). After suffering a stroke in May of the same year, A.A. was admitted to a transitional-rehabilitation center. Later that month, A.A. became a resident at relator's facility to receive long-term care. A.A. had many ailments, including dementia, osteoarthritis, and a history of falling. Thus, relator's director of nursing services, E.J., determined that it was in A.A.'s best interests to stay in a level-four-housing unit, which offered the most staff supervision.

A.A. was non-ambulatory, paralyzed on her left side, wheelchair bound, and required assistance from relator's staff for all activities of daily living. At first, relator implemented various interventions to mitigate the risk of A.A. falling, including a Tabs

---

[1] While the title does not change in consequence of the appeal, we use relator's name as stated in its brief.

alarm,[2] bedrails, a Hoyer lift,[3] a wheelchair, lowering A.A.'s bed to the floor, depression medication, and behavior charting. But A.A. often removed her Tabs alarm and attempted, unsuccessfully, to get herself out of bed.

In 2019, A.A. fell six times while in relator's care. In 2020, she fell four times—each time near her bed. On March 18, 2021, A.A. fell getting out of bed, broke her leg, and was transferred to the hospital for surgery. Afterward, A.A.'s family contracted with a hospice provider for additional services. The hospice provider implemented a winged mattress to mitigate A.A.'s risk of falling out of bed.

On August 1, 2021, A.A. fell again while getting out of bed. She was hospitalized for severe leg fractures. Complications from the fractures resulted in her death ten days later.

Following A.A.'s death, respondent's special investigator (the investigator) completed a survey of relator's facility to determine whether it had complied with chapter 144G of the Minnesota Statutes and Minn. Stat. § 626.557 (2022) (Vulnerable Adults Act). The investigator interviewed relator's staff and A.A.'s family members, conducted a site visit, examined A.A.'s medical records, and reviewed relator's policies and procedures.

The investigator found that A.A.'s "medical record[s] indicated a pattern of behavior over several months of her repeatedly climbing out of bed, which then led to falls," and that relator "did not address these safety concerns with any new interventions."

---

[2] A Tabs alarm clips to the back of a patient's shirt. When the clip is removed, it sounds in the room of the patient, notifying staff that a patient is moving.
[3] A Hoyer lift is a machine, operated by one or two people, that assists a caregiver with moving a patient in and out of bed.

She noted that A.A.'s care card in place at the time of A.A.'s last fall, did not label A.A. as a high fall risk, indicate A.A.'s history of attempting to climb out of bed, or list interventions to address these issues.

The investigator found that relator violated Minn. Stat. § 144G.91, subd. 4, (providing residents have a right to appropriate care and services), because it "failed to create and implement new fall interventions" to address A.A.'s falls. The investigator determined that this conduct constituted maltreatment by neglect, which resulted in A.A.'s death, violating Minn. Stat. § 144G.91, subd. 8 (establishing residents' rights to be free from maltreatment). *See* Minn. Stat. § 626.5572, subd. 17 (defining neglect). Respondent imposed a $5,000 fine for each violation. Relator requested a hearing, contesting both violations.

In July 2022, the parties appeared for a two-day contested hearing at the Office of Administrative Hearings. The Administrative Law Judge (ALJ) heard testimony from three witnesses: the investigator, one of relator's certified nursing assistants, and E.J.

The investigator's testimony was consistent with her survey. She explained that A.A. had a service plan that detailed the cost of the services she received from relator. A.A.'s service plan was to be updated when a change in condition required new services, including changes such as falling or entering hospice. The investigator testified that relator provided A.A.'s service plans from January 28, 2020, and September 14, 2020. But, despite A.A. falling on January 20, February 15, and April 10 of that year, her service plans lacked any new interventions. The investigator also testified that relator's staff told her

4

that any updated fall-intervention plans would be noted in A.A.'s "care cards." Neither of the care cards provided to the investigator reflected any changes to A.A.'s plans.

Relator also provided the investigator with two Resident Monitoring Visit Notes, used to document fall risk assessments. The March 18, 2021, note reflected that A.A.'s mobility/transfer services were reviewed, but no "problems" or "follow up" information was provided. Similarly, the August 3, 2021, note did not list any "problems" or "follow up." E.J. testified that this was because A.A. was admitted to the hospital after both falls, and that relator noted new interventions only after a resident returned to the facility. E.J. later testified that, in her opinion, relator had not committed maltreatment.

In December 2022, the ALJ issued his Findings of Fact, Conclusions of Law, and Recommendation in which he recommended that the commissioner of health (the commissioner) affirm respondent's findings of noncompliance. The ALJ reasoned that relator should have taken additional and more effective steps to address A.A.'s falls, including by implementing the floor mats used for other residents. The ALJ also recommended upholding the $5,000 fine for maltreatment resulting in death but rescinding the $5,000 fine for the violation of Minn. Stat. 144G.91, subd. 4, because chapter 144G prohibits imposing multiple immediate fines for violations arising from the same circumstance. *See* Minn. Stat. § 144G.31, subd. 4(b) (2022).

On April 17, 2023, the commissioner issued her final order adopting the ALJ's Findings of Fact, Conclusions of Law, and Recommendation, except for two findings. The rejected findings did not affect her determination that relator violated chapter 144G.

Relator appeals.

**ISSUES**

I.    **Did the commissioner err in determining that relator violated Minn. Stat. §144G.91, subd. 4, by failing to provide appropriate care to a resident?**

II.    **Did the commissioner err in determining that relator violated Minn. Stat. § 144G.91, subd. 8, by committing maltreatment under Minn. Stat. § 626.5572, subds. 15, 17?**

**ANALYSIS**

When reviewing an agency's decision in a contested case, we may affirm, remand, reverse, or modify the decision "if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are . . . unsupported by substantial evidence in view of the entire record as submitted" or affected by error of law. Minn. Stat. § 14.69(d)-(e) (2022). An agency's interpretation of a statute is a question of law, which we review de novo. *In re Denial of Eller Media Co.'s Applications for Outdoor Adver. Device Permits*, 664 N.W.2d 1, 7 (Minn. 2003). An agency's factual determinations—made within the scope of the agency's statutory authority—are reviewed under the substantial-evidence test. *In re Application of Minn. Power for Auth. to Increase Rates for Elec. Serv.*, 838 N.W.2d 747, 757 (Minn. 2013). Under that test, we assess whether the agency's decision (1) "adequately explained how it derived its conclusion" and (2) is reasonable based on the record. *Id.* "[S]ubstantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and more than a scintilla, some, or any evidence." *In re NorthMet Project Permit to Mine Application Dated Dec. 2017*, 959 N.W.2d 731, 749 (Minn. 2021) (quotations omitted).

Agency decisions "enjoy a presumption of correctness." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn. 2001) (quotation omitted). And we defer to an agency's conclusions on witness credibility and inferences to be drawn from testimony and evidence in the record. *Id.* Relators have the burden of proof when challenging an agency decision on appeal. *In re Excelsior Energy, Inc.*, 782 N.W.2d 282, 289 (Minn. App. 2010).

Relator challenges two aspects of the commissioner's order, that relator violated (1) Minn. Stat. § 144G.91, subd. 4, by failing to provide appropriate care to a resident; and (2) Minn. Stat. § 144G.91, subd. 8, by committing maltreatment under Minn. Stat. § 626.5572, subds. 15, 17.

## I. The commissioner did not err in determining that relator violated Minn. Stat. §144G.91, subd. 4, by failing to provide appropriate care to a resident.

Chapter 144G of the Minnesota Statutes gives the commissioner the duty to enforce the Assisted Living Bill of Rights and regulate assisted-living facilities to ensure the health, safety, well-being, and appropriate treatment of residents of those facilities. Minn. Stat. § 144G.09, subd. 1 (2022). Respondent is the exclusive state agency charged with monitoring and investigating facilities suspected of violating chapter 144G. Minn. Stat. § 144G.30, subd. 1(a) (2022). When respondent finds a violation, the commissioner may issue a correction order. *Id.*, subd. 5(a) (2022). Assisted-living facilities may request a hearing to contest correction orders issued against them. Minn. Stat. § 144G.20, subd. 14 (2022).

Relator asserts two primary arguments for reversal: (A) respondent failed to present substantial evidence that relator violated Minn. Stat. § 144G.91, subd. 4; and (B) relator was not responsible for creating new fall interventions for A.A. once hospice began providing services to her. Relator also asserts (C) arguments related to the burden of proof, witness credibility, and the definition of an up-to-date service plan. We address each argument in turn.

## A.    Substantial evidence supports the commissioner's determination.

The Assisted Living Bill of Rights provides that residents of assisted-living facilities have a right to appropriate care and services "based on the resident's needs and according to an up-to-date service plan subject to accepted health care standards." *Id.*, subd. 4(a). This requires ongoing assessment to identify changes in a resident's needs. Minn. Stat. § 144G.70, subd. 2(c) (2022).

First, the commissioner provided an adequate explanation for her determination. She found that respondent established by a preponderance of the evidence that relator violated Minn. Stat. § 144G.91, subd. 4. The commissioner adopted the ALJ's findings that the violation was based on (1) A.A.'s well-known pattern of falling when trying to climb out of bed, (2) relator's failure to attempt new fall interventions after A.A. experienced falls with serious injuries, and (3) relator's inaction that contributed to the fall which caused A.A.'s death.

Second, the commissioner's determination, adopting the ALJ's findings, is reasonable based on the record. A.A. suffered from dementia, osteoarthritis, and a stroke that paralyzed the left side of her body. She fell at least 11 times while at relator's facility.

8

And relator's staff knew that A.A. routinely attempted to leave her bed and often removed her Tabs alarm.

At the hearing, the investigator testified that A.A.'s available service plans from January and September 2020 did not provide details about what, if any, fall-intervention plans were in place for A.A. Next, both the investigator and E.J. testified that, when a resident falls, the resident is assessed to determine whether new interventions should be implemented; any new interventions are noted on a resident's care cards. Relator provided the investigator with only two care cards: one from July 16, 2021, and one from August 3, 2021—both created after A.A.'s 2021 falls. Both cards revealed the same fall interventions were in place as of the date written on the card, including using a "[t]abs [a]larm at all times," "[t]urn [and] reposition [A.A.] every [two] hours when in bed," and putting "siderails" on A.A.'s bed. Thus, new interventions were not implemented after either A.A.'s March 2021 fall, when she fell out of bed, broke her leg, and was transferred to the hospital for surgery, or the nearly identical fall that led to her death in August 2021.

Relator purportedly kept patient fall-risk assessments in "Resident Monitoring Visit Notes." But the notes preceding A.A.'s March and August 2021 falls stated that A.A.'s "care plan/service plan" was not "reviewed/updated." This was corroborated by relator's nursing assistant.

In contrast, other fall-risk residents with Hoyer lifts at relator's facility were provided with padded floor mats to protect them from falls. The licensed practical nurse working on the morning of A.A.'s last fall stated that A.A. should have been provided with motion-sensor alarms and padded floor mats used to prevent residents from serious fall-

9

related injuries. Similarly, the attendant working the same morning admitted that relator did not implement new fall interventions or administer fall-prevention training specific to A.A. after she fell in March 2021.

Although E.J. testified that her staff exhausted "[e]very intervention that [they] possibly could take," she admitted that she had tried only one motion sensor with A.A., a bed alarm.[4] E.J. also testified that any safety risk posed by using a floor mat with a Hoyer lift could be eliminated by moving the mat, which weighed only two to three pounds and was equipped with handles, out of the way.

On this record, we are satisfied that sufficient evidence supports the commissioner's determination that relator violated Minn. Stat. § 144G.91, subd. 4, by failing to provide A.A. with appropriate care and services considering her condition and history of falling.

**B.      Relator remained obligated to implement new care interventions for A.A.**

Relator asserts that federal and state laws and regulations "ceded authority to hospice to evaluate and implement [new] interventions" for A.A. Relator argues that, although it was responsible for the "care and safety of [A.A.,] . . . its responsibility for evaluation and determination of additional interventions" to prevent falls "effectively shifted" to the hospice provider when it began providing services to A.A. after she fell in March 2021. Relator's argument is effectively an argument based on legal error. *See* Minn. Stat. § 14.69(d) (providing courts may reverse an agency's decision when the petitioner's substantial rights have been prejudiced by an error of law).

---

[4] A bed alarm is a mat that goes under a mattress and sounds when a resident moves.

The ALJ rejected relator's argument stating that relator had "pointed to no law to support [its] position." The commissioner concluded that relator was still responsible for the cited violations, even though the hospice provider was also involved in caring for A.A.

To determine whether a hospice provider's intervention into the care of an assisted living facility's resident alters a facility's obligations to that resident, an issue of first impression in Minnesota, we must look first to the plain language of the relevant statutes. *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 210 (Minn. 2001). If a statute is unambiguous, we must give effect to its plain language. *Id.* When statutory language is silent, we may consider other factors, including the statutory framework and purpose. *Id.* at 211 (rejecting an interpretation of statutory language that would "thwart its very purpose"). But "[w]e cannot add words or meaning to a statute that were intentionally or inadvertently omitted." *Rohmiller v. Hart*, 811 N.W.2d 585, 590 (Minn. 2012).

Under the plain language of chapter 144G, assisted living facilities are defined as those "that provide[] sleeping accommodations and assisted living services to one or more adults." Minn. Stat. § 144G.08, subd. 7. Assisted living services include, among other things, assistance with activities of daily living, standby assistance, therapy, medication management, and hands-on assistance with transfers and mobility. *Id.*, subd. 9 (2022). In contrast, the plain language of section 144A.75 defines hospice services under a narrower scope; focusing on palliative and supportive care for "terminally ill hospice patients and their families" to meet a patient's "special needs experienced during the final stages" of life. Minn. Stat. § 144A.75, subd. 8 (2022). Palliative care "means specialized medical

11

care for individuals living with a serious illness or life-limiting condition." *Id.*, subd. 12 (2022).

Chapters 144A and 144G are silent as to whether a hospice provider—subject to its own obligations under Minn. Stat. §§ 144A.75-.756 (2022)—assumes sole responsibility for assisted-living services, as defined under chapter 144G, when it begins providing services to an assisted-living facility's resident. And assisted-living facilities are subject to their own obligations under Minn. Stat. §§ 144G.01-.9999 (2022); thus, whether a hospice provider also participates in the care of the facility's resident is irrelevant.

Relator's interpretation invites us to add words to Minn. Stat. § 144A.75, subd. 8, which would require hospice providers to be legally responsible for more services than are statutorily required. *See Rohmiller*, 811 N.W.2d at 590 (prohibiting courts from adding language to a statute). And it would relieve assisted-living facilities of their obligations under chapter 144G, when no such exception exists. *Id.* Thus, we decline this invitation.

Next, relator points to 42 C.F.R. § 418.112 (2022). Section 418.112(e) states that hospice providers that care for residents in skilled-nursing facilities (SNF/NF) and intermediate-care facilities for individuals with mental disabilities (ICF/IID) must designate a member of the resident's hospice care team to communicate with the resident's assisted-living-facility care providers. 42 C.F.R. § 418.112(e)(1)(ii); 42 C.F.R. §§ 400.200 (2022) (defining SNF and ICF/IID), .203 (defining NF). These care providers must discuss "the provision of care for the terminal illness and related conditions and *other conditions* to ensure quality of care for the patient and family." 42 C.F.R. § 418.112(e)(1)(ii) (emphasis added). Relator asserts that, when a hospice provider was hired by A.A.'s

family, it became the only entity responsible for A.A.'s "other conditions," including "a propensity for falling," as relator was "subject to [the hospice provider's] administration of the care plan, [and] any changes thereto." We are not persuaded.

First, relator is not an ICF/IID; and the record does not support any argument that relator is a "skilled nursing facility." Second, the regulation requires that the designated hospice provider communicate with relator's care team "to coordinate the hospice care . . . with the medical care provided by other physicians." *Id.* § 418.112(e)(2). "Coordinate" means "to cause to work or function in a common action or effort." *The American Heritage Dictionary of the English Language* 404 (5th ed. 2011). That happened here, as E.J. testified to communicating with the hospice social worker about A.A.'s family's care goals. And E.J. described working "simultaneously" with hospice to provide A.A. care, like a partnership and observed that, once hospice became involved, "[a]ll aspects of care need[ed] to go through hospice," as hospice was free to reject any of relator's care recommendations. But at the hearing, when E.J. was asked whether "once hospice [came] in, [did relator's] assisted living service[] obligations cease?" she responded, "no."

In sum, relator remained responsible for services set forth in chapter 144G and was required to continue evaluating A.A. for new care interventions. Minn. Stat. §§ 144G.08, subd. 9, .91, subd. 4(a).

## C.    Relator's remaining arguments do not require reversal.

First, relator insists that, because the investigator could not offer any alternative interventions that relator had not already attempted, respondent failed to establish by a

preponderance of the evidence that relator failed to provide appropriate services to A.A. And relator insists that the investigator's critique of relator's decision to attempt only one type of motion sensor improperly shifted to relator the burden to prove by a preponderance of the evidence that relator committed maltreatment. We disagree.

Relator has the obligation to provide appropriate care to its residents. *See* Minn. Stat. § 144G.91, subd. 4. The commissioner's decision to hold relator to that obligation does not reflect any burden shifting, as respondent was still required to prove that relator violated chapter 144G. Respondent did so by providing evidence that floor mats, specifically engineered to lessen the impact of a fall, were used with other residents similarly situated to A.A. and could have mitigated the harm to her.

Second, relator argues that the investigator's inexperience made her unqualified to testify about the professional standards of nursing facilities—especially compared to its expert, E.J. This argument is unpersuasive. The ALJ had the authority to determine witness credibility, and the commissioner had the ability to accept or reject those findings. *See In re Thompson*, 935 N.W.2d 147, 156 (Minn. App. 2019) (stating, "[i]t is well-established that appellate courts generally defer to credibility determinations made by an agency's fact-finder"), *rev. denied* (Minn. Dec. 17, 2019).

Respondent's investigator had been licensed as a registered nurse since 2016, previously served as an assisted-living facility supervisor, and completed over 100 maltreatment investigations for respondent. By relying on the investigator's testimony and survey findings, the ALJ found her testimony credible. And, while E.J.'s 20 years of experience with assisted-living facilities and memory care qualified her to testify, they do

14

not constitute a reason to second-guess the ALJ's credibility determinations or the commissioner's decision to adopt the same. *See id.*

Finally, relator asserts that respondent conflated an "updated" service plan with an "up-to-date" service plan, arguing that relator was only responsible for creating the latter. *See* Minn. Stat. § 144G.91, subd. 4(a) (establishing residents' rights to "an up-to-date service plan subject to accepted health care standards"). It submits that the legislature chose the term "up-to-date" because it intended assisted-living facilities to keep resident-service plans that are periodically reviewed. Relator interprets this to mean a service plan can be up-to-date even if no updates are made. We are not persuaded.

First, "up-to-date" and "updated" are synonymous terms.[5] Second, as respondent points out, relator failed to acknowledge the requirement that service plans must still be appropriate based on a resident's needs. *See id.* As discussed above, substantial evidence supports the commissioner's determination that A.A.'s service plan was inappropriate based on her needs.

In sum, relator's supplemental arguments do not warrant reversal.

**II.** **The commissioner did not err in determining that relator violated Minn. Stat. § 144G.91, subd. 8, by committing maltreatment under Minn. Stat. § 626.5572, subds. 15, 17.**

Chapter 144G protects residents of assisted living facilities from "all forms of maltreatment covered under the Vulnerable Adults Act." Minn. Stat. § 144G.91, subd. 8.

---

[5] "Up-to-date" means "[i]nformed of or reflecting the latest information or changes"; and "updated" means "[t]o alter so as to be up to date" or "[t]he act or an instance of bringing something or someone up to date." *The American Heritage Dictionary of the English Language* 1903-04 (5th ed. 2011).

Under the Act, "maltreatment" means abuse, neglect, or financial exploitation of a vulnerable adult. Minn. Stat. § 626.5572, subd. 15. And "neglect" occurs when a caregiver fails "to supply a vulnerable adult with care or services" that are "reasonable and necessary to obtain or maintain the vulnerable adult's" health and safety based on their condition and needs. *Id.*, subd. 17(a)-(b). But failures that result from an "accident or therapeutic conduct" do not constitute neglect. Minn. Stat. § 626.5572, subd. 17(b)(2). An "accident" is defined as an unforeseen event that "could not have been prevented by exercise of due care" and occurs when the facility is "in compliance with the [relevant] laws and rules." *Id.*, subd. 3(1)-(2) (2022).

First, the commissioner adopted the ALJ's finding that relator committed maltreatment by neglect because "reasonable and necessary care was not taken to help prevent [A.A.'s] falls or to help prevent serious injury from falls" and that A.A.'s March and August 2021 falls were not accidents because, despite there being a period of several months where A.A. did not fall, her risk of falling had not disappeared.

Second, the record supports the commissioner's determination. A.A. fell at least 11 times while in relator's care, often while trying to get out of bed. Thus, her fall on August 1, 2021, was foreseeable. Further, the harm to A.A. could have been mitigated if relator had exercised due care. *See* Minn. Stat. § 626.5572, subd. 3. A.A.'s care cards, monitoring notes, and service plans did not indicate that any new fall interventions were implemented after A.A. fell in September 2020 or in March 2021. And relator did not use a floor mat in A.A.'s room, despite using one for other residents who had Hoyer lifts.

16

Because A.A.'s death resulted from fall-related leg fractures, the $5,000 fine levied against relator was appropriate. Minn. Stat. §§ 144G.31, subds. 2(4) (defining a level-four violation to include those that result "in serious injury, impairment, or death"), .4(a)(4)-(5) (providing the commissioner may impose a $5,000 fine for level-four violations of chapter 144G).

## DECISION

Relator remained responsible for its obligations to A.A. under chapter 144G. Because substantial evidence supports respondent's determination that relator violated Minn. Stat. § 144G.91, subd. 4, by failing to provide appropriate care to A.A., and violated Minn. Stat. § 144G.91, subd. 8, by committing maltreatment by neglect under Minn. Stat. § 626.5572, subds. 15, 17, the agency did not err by issuing correction orders and associated fines against relator.

**Affirmed.**